756 So.2d 488 (2000)
Charles H. PRECHT, III, et al.
v.
CASE CORPORATION, et al.
No. 99-1296.
Court of Appeal of Louisiana, Third Circuit.
February 16, 2000.
Writ Denied May 5, 2000.
*491 J.B. Jones, Jr., Jennifer Jones, Jones Law Firm, Cameron, LA, Counsel for Plaintiffs/Appellees/ Appellants-Charles, Donna & Molly Precht Precht.
*492 Glenn Alexander, Jones & Alexander, Cameron, LA, Counsel for Plaintiffs/Appellees/Appellants-Kelly & Flavia Precht.
Michael M. Noonan, Patrick J. O'Cain, McGlinchey Stafford, New Orleans, LA, Counsel for Defendants/Appellants/Appellees.
Court composed of NED E. DOUCET, Chief Judge, MICHAEL G. SULLIVAN, and GLENN B. GREMILLION, Judges.
SULLIVAN, Judge.
This is a products liability case involving a farm tractor that caught fire and burned. The passengers on the tractor, Kelly Precht and his niece, Molly Precht, were burned when they jumped from the tractor to escape the fire. Kelly and his wife, Flavia, and Molly's parents, Charles and Donna Precht, sued Case Manufacturing, Inc., the manufacturer of the tractor. After a jury trial, the trial court granted judgments notwithstanding the verdict on the issues of comparative negligence and damages, awarding Kelly and Molly damages. All parties appeal. For the following reasons, we amend in part, reverse in part, and render as amended.

Facts
On March 22, 1997, Kelly Precht was waterleveling rice fields that he and his brother, Charles, farmed with their father in Sweetlake, Louisiana. Kelly was operating a 1989 Case I-H Model 9150 tractor that was owned and used by the Prechts in their farming operations. Molly was riding with Kelly in the enclosed cab of the tractor. Kelly had been waterleveling for about two hours when the steering wheel on the tractor did not respond as he attempted to turn at the end of a row. He immediately stopped the tractor. As he stopped, Kelly saw white smoke on both sides of the cab, then he saw black smoke and flames hitting the windshield. Not seeing any flames in the area of the door of the cab, Kelly opened the door and threw Molly from the cab into the rice field, jumping out after her. They were both burned by the flames of the fire as they exited the cab. The tractor was a total loss.
Kelly had purchased the tractor from a neighbor. He and Charles personally maintained the tractor, inspecting it daily for leaks or other indications of a problem and performing repairs as needed. A couple of months before the accident, it was necessary for Kelly to change a section of the exhaust pipe on the tractor. He had to install clamps to hold the new section of pipe in place. Before making the repair, Kelly went to Henderson Implement, a Case distributor in Lake Charles, Louisiana, to purchase the parts to be changed. Henderson did not have the parts in stock and advised him to purchase specific parts from an automobile parts dealership. Kelly followed Henderson's advice in making the repair.
After the accident, Kelly and Molly were immediately transported to a hospital in Lake Charles. After a few hours at the hospital, Kelly transferred to the Truman Blocker Burn Center of the John Sealy Hospital at the University of Texas Medical Branch in Galveston, Texas. Kelly was hospitalized there from the early morning hours of March 23 until March 25. When he returned home, he and Flavia continued treatment for his burns at home. Kelly's healing process went well. His last treatment at the Burn Unit was on May 5, 1997.
The fire affected Kelly psychologically as well, and he sought counseling with a clinical social worker because of the impact that the fire had on him. He was diagnosed as suffering from an adjustment disorder with anxiety and depression. Kelly progressed during the course of treatment, but it was estimated at trial that he still needed an additional four to six months of treatment.
Molly's burns were worse than Kelly's. She also transferred from the hospital in Lake Charles and was treated at the Shriner's Burn Institute in Galveston. She *493 was hospitalized for six days. After being discharged from the hospital, she and her parents remained on the premises of the hospital in an apartment for an additional five to seven days. Molly's parents have assisted in the administration of her treatment from the time that she was admitted. She was able to return to school in the fall. At the time of trial, Molly still traveled to Galveston once every three months for checkups. Her treatment at the hospital includes individual and family psychological counseling.
At trial, Charles testified that he also had a Case tractor, a Model 7230. Shortly before the fire on Kelly's tractor, Charles had an experience similar to Kelly's. While operating his tractor, Charles attempted to turn the tractor but the steering wheel did not respond. At the same time, a fluid sprayed on the windshield and white smoke appeared from under the tractor. There was no fire. Upon investigation, Charles determined that the hydraulic line on the steering system had burst. The hydraulic steering hose on the 7230 was situated underneath the floor of the cab of the tractor in the general area of the operator's toes.
At the conclusion of the trial, the jury reached the following verdicts:
1) The Case Corporation 9150 tractor was unreasonably dangerous in its design and the design was a legal cause of the tractor fire.
2) Kelly Precht was negligent and his negligence was a legal cause of Molly's injuries.
3) Charles Precht was negligent and his negligence was a legal cause of Molly's injuries.
4) Case Corporation, Kelly Precht, and Charles Precht were each assigned 33 1/3% fault with regard to Molly's injuries.
5) Molly Precht was awarded $1,390.09 in special damages and $75,000.00 in general damages.
6) No damage award was made to Charles Precht and/or his wife, Donna Precht.
7) Kelly Precht was determined to be contributorily negligent with regard to his claim.
8) Kelly Precht and Case Corporation were each assigned 50% fault.
9) No damage award was made to Kelly or his wife, Flavia Precht.
All parties filed motions for judgment notwithstanding the verdict. Case's motion for JNOV on the issue of manufacturing defect was denied. The trial court granted Charles' and Kelly's motions for JNOV on the issue of comparative negligence, finding that comparative negligence is not applicable to Molly's claims and that Kelly was not negligent with regard to his claims. On the issue of damages, the trial court granted Kelly's motion for JNOV, awarding him $8,527.98 in special damages and $25,000.00 in general damages. Motions for JNOV by Kelly's wife, Flavia, for loss of consortium damages and by Charles and Donna Precht for an increase in Molly's general damage award, damages for loss of consortium for each of them, and damages for mental anguish and emotional distress suffered by Charles were denied.
On appeal, Case argues that the trial court erred in: 1) refusing to grant its motion for JNOV; 2) ruling against it on two evidentiary matters; and 3) granting the Prechts' motions for JNOV. Kelly assigns as error the trial court's inadequate award of general damages. Flavia assigns as error the trial court's denial of her motion for JNOV seeking an award of damages for loss of consortium, services, and society. Charles and Donna assign as error the amount of damages awarded to Molly by the jury, the lack of damages awarded to them, an evidentiary ruling by the trial court, and the trial court's award of expert witness fees.

*494 Motion for Judgment Notwithstanding the Verdict
In Anderson v. New Orleans Public Service, Inc., 583 So.2d 829, 832 (La.1991) (citation omitted), the Louisiana Supreme Court reiterated the criteria first set forth in Scott v. Hospital Service District No. 1, 496 So.2d 270 (La.1986), for determining whether a JNOV has been properly granted pursuant to La.Code Civ.P. art. 1811:
A JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. If there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied. In making this determination, the court should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party.
In reviewing a JNOV, the appellate court must first determine if the trial court erred in granting the JNOV. This is done by using the aforementioned criteria just as the trial judge does in deciding whether to grant the motion or not, i.e. do the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary verdict? If the answer to that question is in the affirmative, then the trial judge was correct in granting the motion. If, however, reasonable men in the exercise of impartial judgment might reach a different conclusion, then it was error to grant the motion and the jury verdict should be reinstated.
A JNOV may be granted on the issue of liability, damages, or both. La. Code Civ.P. art. 1811(F). In general, the standard of review of a JNOV on appeal is twofold. First, we determine "whether the jury verdict is supported by competent evidence and is not wholly unreasonable." Daigle v. U.S. Fidelity and Guar. Ins. Co., 94-304, p. 8 (La.App. 1 Cir. 5/5/95); 655 So.2d 431, 436. We consider all of the evidence in the light most favorable to the party opposing the motion. If we find that the evidence points so strongly and overwhelmingly in favor of the moving party that reasonable persons could not arrive at a contrary verdict on the issue, the JNOV was properly granted. Second, the JNOV is reviewed pursuant to the manifest error standard of review. Id.
Likewise, "[w]hen a trial court grants a JNOV as to damages, both the decision to grant [the JNOV] ... and the resulting increase or decrease in the award must be reviewed." Higley v. Kramer, 581 So.2d 273, 278 (La.App. 1 Cir.), writ denied, 583 So.2d 483 (La.1991). Once we have established that the trial court correctly applied its standard of review in setting aside the jury's damage award, we review the trial court's award under the manifest error standard of review. If there is manifest error in the trial court's award, the jury's damage award should be reinstated. If the award is not manifestly erroneous, it is reviewed under the constraints of Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976), i.e., the abuse of discretion standard of review. Daigle, 655 So.2d 431.
The abuse of discretion standard of review requires an inquiry as to whether the award for the particular injuries and their effects on the particular plaintiff under the particular circumstances is a clear abuse of the much discretion of the trier of fact. Only after such a determination of an abuse of discretion is made, should we resort to prior awards for the purpose of determining the highest or lowest point *495 which is reasonably within that discretion. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).

Standard of Review
A jury's finding of fact may not be reversed absent manifest error or unless it is clearly wrong. Stobart v. State, through Dep't of Transp. and Dev., 617 So.2d 880 (La.1993). The reviewing court must do more than simply review the record for some evidence which supports or controverts the trial court's findings; it must instead "review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous." Id. at 882. The issue to be resolved on review is whether the fact finder's conclusion was a reasonable one, not whether it was right or wrong. Id. The reviewing court must always keep in mind that "if the trial court or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Id. at 882-83, quotingHousley v. Cerise, 579 So.2d 973, 976 (La.1991).

Case Manufacturing's Appeal

Liability
In its first assignment of error, Case argues that the trial court incorrectly applied the Louisiana Products Liability law to its motion for JNOV. The Louisiana Products Liability Act (LPLA) establishes the exclusive theories of recovery against manufacturers for damage caused by their products. La.R.S. 9:2800.51, et seq. La. R.S. 9:2800.54 provides:
A. The manufacturer of a product shall be liable to a claimant for damage proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product by the claimant or another person or entity.
B. A product is unreasonably dangerous if and only if:
(1) The product is unreasonably dangerous in construction or composition as provided in R.S. 9:2800.55;
(2) The product is unreasonably dangerous in design as provided in R.S. 9:2800.56;
(3) The product is unreasonably dangerous because an adequate warning about the product has not been provided as provided in R.S. 9:2800.57; or
(4) The product is unreasonably dangerous because it does not conform to an express warranty of the manufacturer about the product as provided in R.S. 9:2800.58.
C. The characteristic of the product that renders it unreasonably dangerous under R.S. 9:2800.55 must exist at the time the product left the control of its manufacturer. The characteristic of the product that renders it unreasonably dangerous under R.S. 9:2800.56 or 9:2800.57 must exist at the time the product left the control of its manufacturer or result from a reasonably anticipated alteration or modification of the product.
D. The claimant has the burden of proving the elements of Subsections A, B and C of this Section.
Kelly advanced the Prechts' theory of the cause of the fire. He testified that, after the fire, he discussed the events surrounding the fire with Charles and his father, concluding that the hydraulic line to the steering system burst or had a hole in it that caused it to spray hot hydraulic fluid on the exhaust of the tractor which ignited.
Case argues that Kelly's testimony on the cause and/or origin of the fire was improperly allowed by the trial court because he is not an expert in the origins of fires. A lay witness may testify in the *496 form of opinions or inferences if they are rationally based on his perceptions and if they are helpful towards a clearer understanding of the witness's testimony or a fact at issue. La.Code Evid. art. 701. Cho v. Royal Oldsmobile Co., Inc., 98-527 (La. App. 5 Cir. 11/25/98); 722 So.2d 1138.
We find no error with the trial court's allowing Kelly's testimony on this issue because his testimony was based upon inferences drawn from his personal observations at the time of the fire, the incident with the hydraulic hose to the steering system on Charles' Case Model 7230 tractor, and his experience in the mechanical operation of tractors. Immediately before the fire, the tractor's steering wheel turned but the tractor did not. This indicated to Kelly that the steering system's hydraulic line was ruptured or had a hole in it. After escaping from the tractor, Kelly noticed "oil specks up and down his arms." Molly also had oil specks on her. Kelly testified that he, his brother, and father concluded that the fire started in the area of the exhaust because "it's the only ignition place there is for oil to ignite." He explained that the hydraulic line was located under the engine, that it was "wide open" between the hydraulic line and the exhaust, and that the two were close enough for hydraulic fluid to spray on the exhaust and start a fire.
Case next argues that the trial court committed error when it allowed the Prechts' expert, George Green, to testify. Green has a degree in mechanical engineering. He has numerous patents and has worked extensively in his field as an expert. For the last twenty-six years, he has worked as a consultant in safety engineering and accident reconstruction. He has testified in cases involving farm tractors. Green has never designed any equipment for tractor manufacturers, but he has designed tractor equipment for individuals who then installed and used the equipment. The trial court qualified him as an expert in safety engineering, failure analysis, and accident reconstruction. Case argues that it was error for the trial court to allow Green to testify because he is not an expert in agricultural engineering and has never been involved in the design of tractors for tractor manufacturers.
Article 702 of the Code of Evidence provides:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
Note (d) to this provision explains that "[b]road discretion should be accorded the trial judge in his determination as to whether expert testimony should be held admissible and who should or should not be permitted to testify as an expert." In New Orleans Public Service, Inc. v. Louisville and Nashville Railway Co., 94-1625 (La.App. 4 Cir. 3/16/95); 652 So.2d 1033, NOPSI argued that the trial court erred in accepting the defendant's expert, a physicist, because the issues presented involved engineering. In determining that the trial court did not commit error, the court reasoned:
This is a question of discretion. One must look to the facts to determine whether Purrington was allowed to testify outside of his expertise and whether the trial court relied on this testimony in its factual determinations in this case.
Purrington ... relied on principles of physics in arriving at his opinion. NOPSI sought to exclude Purrington's testimony as it pertained to questions of engineering, soil sciences, geotechnical engineering, and accident reconstruction. The trial court may have relied in part on Purrington's testimony in concluding that plaintiff failed to prove that there was a failure in the road bed which was the proximate cause of the accident. Such was not in error since Purrington's testimony pertained to *497 the inappropriate loading method as the cause in fact of the accident. In so doing Purrington was testifying within an area of his expertise. This assignment lacks merit.
Id. at 1037.
Green's testimony was based upon engineering principles as they pertain to safety and tractors. Most of his testimony addressed designs that had been implemented by Case in tractors manufactured by it before the 9150. We find no error with the trial court's qualification of Green as an expert in this case.
At the outset of his testimony, Green testified that he had no reason to disagree with Kelly's theory as to the origin of the fire. According to him, the threat of fire from hydraulic fluid was greater than from fuel because fuel is housed in steel lines and engines are usually enclosed with cowlings to contain fire. Additionally, in his opinion, Kelly's changing the exhaust system on his tractor had nothing to do with the fire.
In denying Case's motion for JNOV, the trial court stated, "Louisiana law allows juries to infer an unreasonably dangerous defect from the circumstances surrounding an accident." Case argues it was error for the trial court to rely upon circumstantial evidence in a products liability case. We find no error.
In cases where the origin and cause of a fire are at issue:
Circumstantial evidence is sufficient. It need not negate all other possible causes. Proof that excludes other reasonable hypothesis of cause with a fair amount of certainty so that it is more probable than not that the fire was caused in a particular manner or scenario is enough to establish liability.
Westridge v. Poydras Properties, 598 So.2d 586, 590 (La.App. 4 Cir.1992), citing Boudreaux v. American Ins. Co., 262 La. 721, 264 So.2d 621 (1972) and Blanchard v. Sotile, 394 So.2d 633 (La.App. 1 Cir.1980), writ denied, 399 So.2d 601 (La.1981).
This court has previously determined that the evidentiary doctrine of res ipsa loquitor applies to products liability cases. In State Farm Mutual Automobile Insurance Co. v. Wrap-On Co., Inc., 626 So.2d 874 (La.App. 3 Cir.1993), writ denied, 93-2988 (La.1/28/94); 630 So.2d 800, a motor home caught on fire and burned while the owners were out of town. The theory for the origin of the fire was that Wrap-On's heat tape which the owner had used to wrap exposed pipes on the motor caught fire. Wrap-On argued that, without substantive proof of a theory set out in the Louisiana Products Liability Act, plaintiffs proof that the heat tape was the only possible source of the fire was insignificant. This court found that the plaintiff successfully used the doctrine of res ipsa loquitur to prove that the heat tape was unreasonably dangerous in construction or composition and was the cause of the fire.
It is undisputed that Kelly's tractor burned; that the hydraulic steering system on the tractor malfunctioned; that Kelly and Molly had oil on them after the accident; that hydraulic oil is a fuel source; that the exhaust was a heat source; and that the fire occurred in the area of the steering system's hydraulic hoses and the exhaust. No other potential source of the fire was identified. The Prechts' expert found Kelly's theory of the fire reasonable. Case's experts gave their opinions as to why the fire would not have occurred as theorized by Kelly, but agreed it was possible the fire could have occurred as Kelly explained.
The jury found Kelly's tractor to be unreasonably dangerous in design as defined by La.R.S. 9:2800.56. The trial court denied Case's motion for JNOV, determining that the Prechts could not be certain if their claim was based on a defect in design (La.R.S.9:2800.56) or a defect in manufacturing (La.R.S.9:2800.55). The trial court held that the "jury could have inferred that the exhaust system was mismanufactured." Case argues that because the trial *498 court found that the jury could have inferred a defect in manufacturing, as opposed to a defect in design, it substituted its judgment for the judgment of the jury. We do not agree. While the reasons of the trial court and the jury may have been different, the result was the same: Kelly Precht's Case I-H Model 9150 tractor was unreasonably dangerous.
The LPLA provides four exclusive theories of recovery against a manufacturer. The Act requires a plaintiff to prove that the product in question is unreasonably dangerous. A product can be unreasonably dangerous in four different ways, i.e., in construction or composition, in design, in inadequate warning, or in not conforming to an express warranty. La.R.S. 9:2800.54. A plaintiff can prove that a product is unreasonably dangerous in one or more of those four ways. While a plaintiff may urge only one theory for recovery, the evidence presented at trial may actually prove that the product is unreasonably dangerous in more than one way under the Act.
To determine whether the trial court committed error in denying Case's motion, we ask "do the facts and inferences point so strongly and overwhelmingly in favor of [Case] that reasonable men could not arrive at a contrary verdict?" Anderson, 583 So.2d at 832. The jury's verdict and the trial court's reasons for denying the motion for JNOV demonstrate that "reasonable men in the exercise of impartial judgment [did] reach a different conclusion." Id. We find no error with the trial court's denial of Case's motion for JNOV.

Comparative Fault
The determination of whether comparative fault is applicable is a legal question to be decided by the court. Trahan v. Savage Indus., Inc., 96-1239 (La. App. 3 Cir. 3/5/97); 692 So.2d 490, writs denied, 97-1636, 97-1652 (La.10/3/97); 701 So.2d 207, 209; Falgoust v. Richardson Indus., Inc., 552 So.2d 1348 (La.App. 5 Cir.1989), writ denied, 558 So.2d 1126 (La. 1990). Therefore, the trial court's determination that comparative fault is not applicable to Molly's claims is not subject to the JNOV review applicable to factual issues that are within the province of the jury.
With regard to Molly's claims, the jury assigned 33 1/3% fault each to Case, Charles, and Kelly. In granting the Prechts' motion for JNOV on this issue, the trial court concluded that their placement of Molly in the cab of Kelly's tractor was not a legal cause of her injuries and revised the jury's verdict to that effect. The trial court reasoned:
Thus, it can be seen that the policy question in weighing comparative negligence against a manufacturer defect is a matter of law to be decided by the court. In the case before the court, the comparative fault of the father and uncle of the child victim relates to their placing the child in the driver's cab of the tractor.... [T]his action constituted negligence for the reason that it exposed the child to dangers such as falling from the cab, interfering with the operator, being injured in the case of a tractor accident such as collision or overturn or some other such contingencies. Comparative negligence does not apply in the event of something totally unforeseen and beyond the scope of the duty breached by the contributing negligence. In this case, there was a mysterious and catastrophic fire. That this was a risk not encompassed in the duty breached by the father and the uncle is made clear when one considers that the nature of this failure (the fire) made the age and/or number of passengers irrelevant. No one was safe in that tractor cab. The presence of warnings about passengers in the cab adds nothing to the question of negligence because, obviously, they were not related to the possibility that the cab may be suddenly engulfed in a destructive fire.
It is the holding of the court that in relation to the claim of Molly Precht *499 against Case Corporation, the negligence of the father and of the uncle was not a legal cause and does not affect that claim. In this regard, the holding of the jury is revised.
Case argues that the trial court's granting of the JNOV as to the jury's allocation of fault to Charles and Kelly Precht for Molly's claim constituted error. It argues that the trial court's reliance upon the holding of Bell v. Jet Wheel Blast, Div. of Ervin Indus., 462 So.2d 166 (La.1985), to determine that comparative fault was not applicable to Molly's claims was improper.
Article 2323 of the Civil Code requires that fault be allocated to all persons causing a plaintiffs injuries. This article limits the liability of each wrongdoer, with certain exceptions, to his percentage of fault; it provides in pertinent part:
A. In any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined,...
B. The provisions of Paragraph A shall apply to any claim for recovery of damages for injury, death, or loss asserted under any law or legal doctrine or theory of liability, regardless of the basis of liability.

(Emphasis added.)
Before there can be an allocation of fault as required by Article 2323, a duty-risk analysis must be performed to determine whether a party who is alleged to be at fault can be held liable. Morrison v. Kappa Alpha PSI Fraternity, 31,805 (La.App. 2 Cir. 5/7/99); 738 So.2d 1105, writs denied, 99-1607, 99-1622 (La.9/24/99); 749 So.2d 634, 635.
The trial court determined that Charles and Kelly owed a duty to Molly. We agree with that conclusion. The trial court then determined that the risk that Molly would be injured by a "mysterious" fire on the tractor was not within the scope of protection of that duty. In Roberts v. Benoit, 605 So.2d 1032, 1044-45 (La.1991), the Louisiana Supreme Court discussed at length the concept of scope of protection, stating:
[T]he scope of duty inquiry is ultimately a question of policy as to whether the particular risk falls within the scope of the duty.... In short, the scope of protection inquiry asks "whether the enunciated rule or principle of law extends to or is intended to protect this plaintiff from this type of harm arising in this manner."
(Citations omitted.)
Accordingly, we ask: did Charles' and Kelly's duty to protect Molly from injury on the tractor include the risk that a fire of unknown origin would occur on the tractor, resulting in injury to Molly? We agree with the reasoning of the trial court that the answer to this question is "no."
With regard to Kelly's claims, the jury determined that he was 50% at fault in causing his injuries. The only evidence of fault on the part of Kelly was his failure to use the emergency exit when escaping the fire. The emergency exit was the rear window of the tractor. A strip around the window allowed an occupant of the cab to pull the strip, push out the window, and exit through the window onto the rear of the tractor. He would then have to climb down off of the tractor to the ground.
The sudden emergency doctrine is available to a person who finds himself or herself in a position of imminent peril and does not have sufficient time to consider and weigh all of the best means available to avoid that impending danger. Such a person is not guilty of negligence if he or she fails to adopt what subsequently and upon reflection may have been a better means to avoid the peril.
Babineaux v. Tollie Freightways, Inc., 628 So.2d 1327, 1330 (La.App. 3 Cir.1993) (citations omitted).
*500 We find that the sudden emergency doctrine is applicable to Kelly's claim. Applying this doctrine to the evidence presented in this case, we conclude that the jury's verdict is not based on competent evidence and is wholly unreasonable. The trial court's grant of Kelly's motion for JNOV on the issue of his contributory negligence was proper.

Kelly and Flavia Precht's Appeal
Kelly seeks an increase in the $25,000.00 general damage award by the trial court on his motion for JNOV. On the other hand, Case appeals the trial court's award of damages to Kelly. Upon admission to the Blocker Burn Unit in Galveston, Kelly was very stable. His burns were all second degree burns involving his face and hands and covered less than ten percent of his body. During his two and one-half day stay in the unit, his wounds were cleansed in a tubbing process in which the burned skin was removed by scrubbing and/or scraping it off. Thereafter, antibiotic ointment was spread on his wounds, and he was bandaged. This process had to be performed each day Kelly was in the hospital and for six days after he returned home. Kelly described how painful the tubbing was. Although he was given pain medication before the procedure, it did not alleviate the pain. Dr. Manubhai H. Desai, Kelly's treating physician, confirmed that this process is very painful for burn patients.
The skin on Kelly's hands broke down easily during the healing processhis hands would crack and bleed, requiring him to wear gloves for a number of months to prevent the problem. Due to the fact that Kelly is a farmer, he must now take extra precautions, such as wearing long sleeve shirts while working, to protect himself from the sun. At the time of the trial, there was still a difference in the pigmentation on Kelly's left hand and right arm.
Dr. Desai testified that Kelly did extremely well during his treatment at the hospital and thereafter. His wounds healed quickly, and he was released from Dr. Desai's care on May 5, 1997. Upon release, he was advised to use lubricants to keep his skin soft and sun protectants to prevent further burn. Dr. Desai described Kelly's burns as "very superficial" and expected the scarring associated with his burns to take nine months to one year to resolve completely. Dr. Desai did not place any physical limitations on Kelly as a result of his burns.
Charles Monlezun, a clinical social worker, treated Kelly beginning July 29, 1997 for psychological problems that he experienced after the fire. At the time, Kelly was found to be anxious but not significantly so. Mr. Monlezun believed that Kelly was under-reporting or minimizing his symptoms. Kelly described intrusive thoughts and images, nightmares, and hyper-vigilance to Mr. Monlezun. At trial, Kelly testified that the smell of Clorox bleach, which was used in the tubbing process, continued to remind him of the scrubbings. The memories would cause him to become nauseated and experience chills.
Flavia testified that since the fire, there are times when Kelly cries. She explained that he had a hard time returning to work and operating a tractor. He often calls her when he is on the tractor seeking comfort. Many of those times he is crying. He has had nightmares since the fire.
Mr. Monlezun's diagnosis was an adjustment disorder with anxiety and depression. Kelly saw him weekly from July through October 1997. From November 1997 until trial he saw him every two weeks. At trial, Mr. Monlezun was of the opinion that Kelly was 50-60% better and that the worst part was behind him. His final diagnosis was post-traumatic stress disorder. In his opinion, he believed Kelly needed additional treatment of four to six months, one to two times per month.
We find no error with the trial court's grant of Kelly's motion for JNOV, as we find it completely unreasonable for the *501 jury to conclude that Kelly did not suffer any damages as a result of the fire. However, we find the general damage award of $25,000.00 to be error. The trial court found Kelly's proof of psychological damages to be speculative. Based upon the evidence, we find this to be an abuse of discretion. Considering the physical and mental suffering endured by Kelly as a result of the fire, we increase the award of general damages to $50,000.00. Additionally, we increase the award for special damages to $9,427.98 for expenses Mr. Monlezun testified Kelly would incur for the additional treatment he recommended.
Flavia appeals the jury's failure to award her damages for loss of consortium. As noted by the trial court, Kelly and Flavia testified that his injuries did cause them anxiety, stress, and tension. Flavia was unable to assist during Kelly's tubbing procedure because she could not bear to witness the suffering Kelly had to endure. After the tubbing procedure was no longer necessary, she began dressing his wounds. She often had to use tweezers to pull dead skin from Kelly's burns. When Kelly had problems working, especially when he was on the tractor, she would comfort him. There were times when she had to ride with Kelly in the tractor to relieve his anxiety. Kelly's nightmares disturbed Flavia.
Kelly could not do all of the things around the house that he did before the fire. For a year or so, he could not cut the grass or do repairs. Oftentimes, Flavia had to do these chores. For a period of time, Kelly was not able to attend baseball games or engage in other social activities with her as he had before.
The compensable elements of damage in a loss of consortium claim are loss of society, sex, service, and support. "Society" is broader than loss of sexual relations. It includes general love, companionship, and affection that the spouse loses as a result of the injury. "Support" is the lost family income that would go to support the uninjured spouse. "Service" is the uncompensated work around the house or educational help with the children which will, as a result of the injury, have to be obtained from another source and at some price.
Broussard v. Romero, 96-973, p. 12 (La. App. 3 Cir. 2/26/97); 691 So.2d 1265, 1273, writ denied, 97-670 (La.4/25/97); 692 So.2d 1092, quoting Rowe v. State Farm Mut. Auto. Ins. Co., 95-669, p. 25 (La.App. 3 Cir. 3/6/96); 670 So.2d 718, 732, writ denied, 96-0824 (La.5/17/96); 673 So.2d 611.
The jury's failure to award Flavia damages for loss of consortium was an abuse of discretion. Considering the duration of Kelly's injuries and the rapid improvement of his physical injuries, we find the amount of $1,500.00 to be the lowest award that the jury could have reasonably awarded.

Charles and Donna Precht's Appeal
Charles and Donna appeal the trial court's denial of their motion for JNOV which sought an increase in Molly's general damage award, damages for loss of consortium for each of them, and damages for mental anguish and emotional distress suffered by Charles.
Dr. David Herndon at the Shriner's Institute treated Molly. He described her burns as superficial second degree burns. He defined a second degree burn as a burn causing a blister that does not extend all the way through the skin. Molly's burns were below her right eye, an area eight centimeters in length above her waistline, the top of her right forearm, upper arm and hand, her right lateral thigh and lower leg, and her left medial thigh. Her burns were scrubbed daily with soap and water during her eight-day stay in the hospital and continued for the five to seven days she and her parents stayed in an apartment at the hospital. After the first two days that she was at the hospital, Molly would become fearful and agitated when she woke in the morning, anticipating the scrubbing that she knew she would have to undergo later in the morning.
*502 Pursuant to the hospital's policy, Charles and Donna assisted with the scrubbings. Charles would scrub, and Donna would attempt to hold Molly down. Often Molly was combative and angry with her parents because she had to endure the procedure. As with Kelly, all loose skin had to be removed from Molly's burns. Then her wounds would be dressed with medication and bandages. This dressing process was also painful for her. After being home for about two months, the pain associated with bathing was relieved when the skin closed around her burns.
Molly attended physical therapy and occupational therapy as part of her treatment. On one occasion, she refused to perform her therapy because of the pain she experienced with the therapy.
Molly has had to wear Jobst pressurized garments on her arms, hand, and legs. She was scheduled to quit wearing the arm and hand stocking in July 1998. At the time of trial, it was anticipated that she would be able to quit wearing the Jobst pantyhose in another two years.
Dr. Herndon described the progress of Molly's burns. Over the first six months after her injury, her scars became raised and red, more colorful. Then between one and two and one-half years after the injury, the scars began to subside. Photographs taken just before the trial revealed that the burns over her lip and below her eye had resolved, although there was still some discoloration; there was still a raised scar on her right knee approximately five by three centimeters in size; there were two small inclusion cysts in a hair gland or sweat gland that was covered by a scar. Dr. Herndon expected the scars to decrease over the next year and become soft and supple and similar in quality to the other scars. He indicated that the scars itched Molly from the beginning and were expected to continue to itch for another one and one-half years. Donna testified that the itching was often very bad at first. Molly took Benadryl to relieve the itching. Once she returned to school, the drowsiness she experienced after taking the Benadryl interfered with her classes.
In Dr. Herndon's opinion, Molly would not need additional treatment, such as surgery, for her scars. He described her skin as soft and supple as the surrounding skin except for the spot over her right knee. Dr. Herndon did not expect any physical limitations to result from the burns. At the time of trial, Molly was still being seen at the clinic once every three months.
In addition to the treatment for her burns, Molly has been counseled by Dr. Patricia Blakeney, a psychologist at the Institute. Dr. Blakeney first saw Molly when she was in the hospital. During her hospitalization, Molly suffered with pain and nightmares. Patients' pain levels are monitored to determine the amount of morphine, or other pain medication, that should be administered. Molly's highest level of pain occurred during the tubbing procedure, when her burns were scrubbed. Her pain level at those times were at the highest level recorded for burn patients. During exercise, her score was two, which was described by Dr. Blakeney as being "very mild discomfort." When she was not undergoing any procedure or exercise, Molly's pain level was zero.
After being discharged from the hospital, Molly was evaluated more extensively by Dr. Blakeney, who determined that she had some post-traumatic stress. Post-traumatic stress symptoms are nightmares, fearfulness, anxiety, and irritability. Molly experienced all of these symptoms.
Molly was six years old at the time that she was burned. Her birthday was March 29 with Easter being right after her birthday that year. Dr. Blakeney explained that Molly progressed well, however, at the anniversary of the accident, she experienced some regression, which is common among burn victims. Because Molly's birthday and Easter occurred shortly after the accident, Dr. Blakeney expects her to always experience some problems at these times each year.
*503 Donna testified that Molly still had nightmares at least once a week. She also continued to experience sleep disturbance and sleep walking at the time of the trial. According to Dr. Blakeney, from a physician's point of view, sleep disturbance is the most disconcerting of the symptoms because without adequate sleep everything else is more difficult. Another concern voiced by Dr. Blakeney is that Molly might develop phobias, which is not uncommon with burn victims. Molly has specific fears of heavy machinery and tractors, but as of the trial date, she had not developed any phobias.
Dr. Blakeney testified that Molly has done well, attributing much of this to Molly's close relationship with parents, siblings, and other family members. However, Dr. Blakeney expects certain situations in Molly's future to cause a recurrence of her psychological symptoms. She relates this to Molly's scars. Dr. Blakeney testified that Molly has progressed to the point where she accepts that she is not ugly; however, she is adamant that her scars are ugly. She knows that she is different and does not like it. On at least one occasion, she got physically ill after another child commented on the fact the she looked different. Dr. Blakeney identified particular stages in Molly's development that she expects would trigger a recurrence of stress associated with the fire: the age of ten or so, when children tend to develop cliques among their friends; her early teenage years; and when she begins dating. At these stages, Dr. Blakeney expects Molly and her family to need more counseling. At this point, Dr. Blakeney describes Molly as moderately distressed.
The jury awarded $75,000.00 to Molly for general damages and $1,823.45 in special damages. The only medical expenses the Prechts were responsible for was Molly's initial treatment at the hospital in Lake Charles because treatment at the Shriner's Burn Institute is free. We find the award of general damages to be abusively low and increase the award to $125,000.00.
The requisites for parents to recover for loss of consortium when their child has been injured was recently addressed in Morrison, 738 So.2d at 1122:
Civil Code art. 2315 gives parents a cause of action for loss of consortium when their child is injured by the fault of another. Parents must prove, by a preponderance of the evidence, any one or more of the following: (1) loss of love and affection, (2) loss of society and companionship, (3) loss of performance of material services, (4) loss of financial support, (5) loss of aid and assistance, and/or (6) loss of fidelity.
A child may sustain physical injury without necessarily causing his parents a loss of consortium. Mental anguish suffered by the parents because of an injury to their child is not compensable in a loss of consortium claim.
(Citations omitted.)
According to Dr. Blakeney, the closeness of the Prechts has made Molly's recovery better than burn victims who do not have the family support that Molly has had. Naturally, Molly's experience has been very stressful and hurtful for them, yet they have done an outstanding job as parents, doing everything they can to help Molly through this ordeal. As indicated above, Dr. Blakeney expects this to continue for many years to come.
Charles and Donna had to administer painful treatment to Molly. She fought them and argued to try and avoid the treatment. They have argued with each other on what is best for Molly and how different situations should be handled. We find the jury's failure to award damages to Charles and Donna for loss of consortium to be an abuse of discretion and award each $5,000.00.
Charles has a claim for "bystander" damages under La.Civ.Code art. 2315.6, which provides in part:

*504 B. To recover for mental anguish or emotional distress under this Article, the injured person must suffer such harm that one can reasonably expect a person in the claimant's position to suffer serious mental anguish or emotional distress from the experience, and the claimant's mental anguish or emotional distress must be severe, debilitating, and foreseeable. Damages suffered as a result of mental anguish or emotional distress for injury to another shall be recovered only in accordance with this Article.
Recovery of bystander damages was recently reviewed by the Louisiana Supreme Court in Trahan v. McManus, 97-1224, p. 11 (La.3/2/99); 728 So.2d 1273, 1279 (footnotes omitted), in which the Court observed:
The requirements of Article 2315.6, when read together, suggest a need for temporal proximity between the tortious event, the victim's observable harm, and the plaintiff's mental distress arising from an awareness of the harm caused by the event. The Legislature apparently intended to allow recovery of bystander damages to compensate for the immediate shock of witnessing a traumatic event which caused the direct victim immediate harm that is severe and apparent, but not to compensate for the anguish and distress that normally accompany an injury to a loved one under all circumstances.
One moment Charles saw Kelly's tractor and did not notice any problems. Next, he saw the whole cab of the tractor totally engulfed in flames; he could not even see the roof of the cab. As Charles approached the burning tractor, he thought Molly and Kelly were in the tractor. Then, he saw Molly come out, followed by Kelly. When he reached Molly, he saw that her hair was burned and her face was peeling. The shock experienced by Charles when witnessing these events is the type of shock the supreme court described in Trahan as warranting recovery for bystander damages. Accordingly, we find the jury's failure to award him bystander damages to be an abuse of discretion. We award the amount of $5,000.00 to Charles for bystander damages.

Video Tape
The Prechts next assert that the trial court committed error when it refused to allow them to introduce a four and one-half hour video of Molly during her treatment, including scrubbing. Instead, the court allowed a twelve minute segment of the tape to be introduced and shown to the jury. This issue was considered in Olivier v. LeJeune, 95-53, p. 8 (La.2/28/96); 668 So.2d 347, 351, quoting Lafleur v. John Deere Co., 491 So.2d 624, 632 (La.1986) and Orgeron v. Tri-State Road Boring, Inc., 434 So.2d 65, 68 (La. 1983):
The determination of whether motion pictures or video tapes are admissible is largely within the discretion of the trial court....
[E]vidence in the form of moving pictures or videotapes must be approached with great caution because they show only intervals of the activities of the subject, they do not show rest periods, and do not reflect whether the subject is suffering pain during or after the activity.
The trial court explained its reasons for not allowing the entire video to be shown to the jury. We find no error with the trial court's ruling on this issue.

Court Costs
By their final assignment, the Prechts appeal the trial court's refusal to assess all of George Green's $10,096.94 fee as court costs. We disagree.
The trial court is vested with much discretion in setting expert witness fees and assigning them as costs, and appellate courts are not permitted to change such awards unless the record on appeal reveals a serious abuse of discretion. Johnson v. Manuel, 95-913 (La.App. 3 Cir. 1/31/96); 670 So.2d 273, writ denied, *505 96-0540 (La.4/19/96); 671 So.2d 919. Moreover, the amount charged by an expert is not conclusive in fixing the amount of his fee. Landry v. Central Indus. Inc., 592 So.2d 478 (La.App. 3 Cir.1991), writ denied, 593 So.2d 381(La.1992).
Muse v. Dunbar, 97-582, p. 14 (La.App. 3 Cir. 6/10/98); 716 So.2d 110, 118.
The Prechts filed a motion to tax costs after trial. At the conclusion of the hearing on the motion, the trial court set Mr. Green's fee at $2,000.00. We have reviewed the trial court's reasons for not awarding the full fee and conclude the trial court did not abuse its discretion.

Conclusion
The denial of Case's motion for JNOV is affirmed. The grant of the Prechts' motion for JNOV on the issue of comparative negligence being applicable to Molly's claim and Kelly's claim is affirmed. The grant of Kelly Precht's motion for JNOV on the issue of damages is amended to increase his award of general damages to $50,000.00 and his special damages to $9,427.98. The denial of Flavia Precht's motion for JNOV for damages for loss of consortium is reversed, and she is awarded $1,500.00. The denial of Charles and Donna Precht's motion for JNOV for damages for loss of consortium is reversed, and they are each awarded $5,000.00; the denial of Charles Precht's motion for JNOV for bystander damages is reversed, and he is awarded $5,000.00. Molly's general damage award is increased to $125,000.00. The judgment of the trial court is affirmed in all other respects.
AMENDED IN PART; REVERSED IN PART; AND AFFIRMED AS AMENDED.