**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

_____

No. 01-30947
Summary Calendar
_____

Russell Woodling,

Plaintiff-Appellee,

versus

Hubbell Incorporated,

Defendant-Appellant.

_____

Appeal from the United States District Court
For the Eastern District of Louisiana
(No. 99-cv-1193)
_____
April 8, 2002

Before DAVIS, BENAVIDES, and CLEMENT, Circuit Judges.

PER CURIAM[*]:

Hubbell Incorporated ("Hubbell") challenges the district court's order finding it 70% liable following an accident involving an electrical switch manufactured by Hubbell. Russell Woodling ("Woodling"), an electrical contractor, was injured while connecting a switch wire to wires for an overhead flourescent fixture. Woodling filed suit against Hubbell under the Louisiana Products Liability Act ("LPLA"), La.R.S. §9:2800.54, alleging that

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

the electrical switch manufactured by Hubbell was unreasonably dangerous in construction or composition and/or design. Hubbell argued that there was no evidence that there was a malfunction in the switch and that it should be absolved from liability because Woodling failed to follow safety procedures for handling electrical switches. Because we find that the district court did not err in concluding that there was a defect in the switch or in its allocation of fault, we affirm the decision.

I. Facts and Proceedings

On April 16, 1998, Woodling was working as an electrician for SECO Industries, Inc. ("SECO") installing electrical switches on an oil platform. The switch at issue was a single on/off toggle switch manufactured by Hubbell and installed on the morning of the accident. Woodling was utilizing the switch as a means of de-energizing the circuit on which he was working in order to connect the wires. At the time of the accident the switch was toggled down in the "off" position. The circuit, however, remained active as other crews were working on the platform and were relying on it for electricity. When Woodling made contact with the switch he sustained a shock resulting in severe injuries. Following the accident, an examination of the switch revealed that the contacts had been welded together effectively causing the switch to be "on" regardless of the position of the toggle. It was determined that, for the contacts to have been welded together, a temperature of

2

1,750 degrees Fahrenheit would have to have been attained.

SECO has certain safety policies outlined in its employee safety manual. Two of the safety procedures required turning the circuit breakers off before handling wires and testing the switches with a voltage tester before use. Woodling failed to do both.

Woodling filed suit in the Eastern District of Louisiana on April 15, 1999 alleging that the switch was defectively manufactured by Hubbell. The trial was bifurcated and the district court held a bench trial on the liability issue on June 1, 2000. The main issue before the district court was whether the cause of the contacts being welded together occurred at Hubbell's factory or during the accident. The district court concluded that the defect occurred at Hubbell's factory and found it liable for the manufacture of the defective switch, assigning 70% fault to Hubbell and 30% fault to Woodling for his comparative negligence. Hubbell timely filed a notice of appeal.

## II. Analysis

There are two issues on appeal. First, Hubbell argues that the expert testimony provided by Woodling at trial was insufficient proof of a defect under the LPLA. Second, the district court erred in its fault allocation based on the evidence presented at trial that the accident could have been completely avoided had Woodling followed SECO's safety precautions.

### A. Standard of Review

Judgment was entered following a bench trial on the issue of liability.  We review the district court's findings of fact for clear error and its legal determinations de novo.  *See* Canal Barge Co., Inc. v. Torco Oil Co., 220 F.3d 370 (5th Cir. 2000)(citations omitted).  Hubbell and Woodling agree that, in a product liability action, the determination of fault under the LPLA is a question of fact subject to the manifest error standard of review.  However, Hubbell submits that the district court's determination that Woodling's expert testimony was sufficient under the LPLA to support a finding of a manufacturer's defect was a conclusion of law and subject to de novo review. We disagree.  Whether a defect existed while under the manufacturer's control is an element of proof under the LPLA.  The existence of an element of proof under the LPLA is a factual finding subject to the manifest error standard of review.  *See* Ellis v. Weasler Engineering, Inc., 258 F.3d 326, 332 (5th Cir. 2001); Precht v. Case Corp., 756 So.2d 488, 495 (La. App. 3rd Cir. 2000).

### B.  Louisiana Products Liability Act

Woodling's claim arises under the LPLA, the sole ground for recovery against the manufacturer of an allegedly defective product.  Of the exclusive theories of recovery under the LPLA, Woodling filed suit alleging that the switch was unreasonably dangerous in construction or composition and/or design. La.R.S. §9:2800.54(B).  Under the LPLA, the plaintiff bears the burden of

4

proving the elements of his claim. Therefore, Woodling had the burden of proving that a defect existed in the switch when it left the manufacturer's control. Hubbell argues that Woodling failed to prove that the defect existed at the time the product left Hubbell's factory. The defect in the switch occurred because the contacts were welded together after exposure to a significant amount of heat. The parties stipulated that the heat required to melt the contacts causing them to weld together was 1,750 degrees.

Both Hubbell and Woodling introduced testimony to support their respective theories as to when the defect occurred. The experts that testified on this issue gave conflicting explanations as to the most probable cause of the defect. Hubbell's position was that the contacts of the switch were welded together at the time of the accident. Woodling's expert concluded that the amount of electricity required to melt the contacts could only have occurred at the factory.

The switch was made from an automated assembly machine. Trial testimony revealed that the switches undergo a multiple step testing process prior to being deemed sufficient. Hubbell's engineer, Robert Carlson ("Carlson") explained the assembly and testing process of the switches. The final automatic inspection test consists of ten steps which detects any malfunction or defect without damage to the switch. There is no dispute that the tests conducted by Hubbell ordinarily do not generate sufficient heat to melt the contacts. Step eight, the continuity and dielectric test,

5

verifies that the switch will stop the flow of electricity when the toggle is in the "off" position. This test subjects the switch to 1,800 volts, and, if there is any problem with a switch at any stage of the testing, the switch is kicked off the line and placed in a rejection pile.

Woodling's expert, George Cassellas ("Cassellas"), concluded that, more likely than not, the switch contacts were welded together at Hubbell's factory and not at the time of the accident. Cassellas opined that the welding probably occurred through an anomaly in the testing process. In reference to the dialectic test, Cassellas explained to the court that a common type of failure in a high voltage situation is arcing. He defined an arc as "an ionization of the air gap between the two electrical contacts...in high voltage...[which] will generate high energy, but very little current." It was a high surge of electrical energy which caused the contacts to become welded rendering the switch on regardless of the position of the toggle according to Cassellas.

In response to this hypothesis, Carlson explained to the court that, had there been an arc, it would show "as a continuity on the tester, and...the tester automatically trips, the part is indicated as a bad part, and the switch is rejected and kicked off the line." However, there was no test performed at Hubbell which would have indicated whether an arc had occurred after the dialectic test had it not been removed from the line. The last two steps of the inspection process do not check for arcing.

6

In concluding that the welding occurred at Hubbell's factory, Cassellas explained that the switch had only been installed the morning of the accident. As a result "[t]here was a very small window of opportunity for any electrical fault to have occurred that would have caused the amount of energy necessary...to cause the welding of the contacts." Additionally, Cassellas' conclusion was based on the fact that there did not appear to be any damage around the area which would have indicated a short or fault in the circuit. Cassellas admitted that there was no physical evidence that an anomaly occurred during manufacture or testing.[1] However, Cassellas concluded that the defect occurred at the factory because Woodling was not killed or more severely injured and there was no damage at the site of the accident precluding the possibility that a surge generating enough heat to weld the contacts occurred at the time of the accident.

Carlson and Cassellas also based their respective conclusions as to when the defect occurred on the severity of the shock suffered by Woodling. Cassellas explained that the amount of electricity that the human body can sustain without resulting in death is less than the amount of electricity it would take to weld the contacts together. Based on the average resistance of the

_____

[1] Hubbell has a policy of disposing of documents after ninety days. Additionally, there was a hurricane in Puerto Rico where the factory was located which destroyed any documents that were not disposed of pursuant to this policy.

human body to electrical encounters of this sort, Cassellas concluded that the amount of electricity that went through Woodling was not enough to weld the contacts regardless of what the maximum amount of electricity was that could have contacted Woodling. The amount of electricity necessary to weld the contacts together at the time of the accident would have killed Woodling.

Carlson opined that there was a parallel path through which the energy traveled which caused the welding to occur without killing Woodling. Woodling had a tool in his right hand which he was using to strip the wire while his left hand was free. He was also surrounded by metal parts while installing the fixtures. Carlson testified that his left hand probably came in contact with something which was grounded providing a ground path for Woodling. As a result, there was enough energy to weld the contacts without causing more serious damage to Woodling.

Based on the testimony of Cassellas and Carlson, the district court concluded that it was "more probable than not under all the evidence and circumstances that the fusion did occur during the manufacturing and/or production and/or...inspection process." We agree. While Wooding bore the burden of proving that the defect occurred while under the control of Hubbell, he was not required to show absolutely that the defect occurred at the factory. We are mindful that "'Louisiana law does not allow a fact finder to presume an unreasonably dangerous [condition] solely from the fact that injury occurred;'" however, the district court did not err in

its determination. Krummel v. Bombardier Corp., 206 F.3d 548, 551 (5th Cir. 2000)(quoting McCarthy v. Danek Medical, Inc., 65 F.Supp.2d 410, 412 (E.D.La. 1999)). "Circumstantial evidence may be sufficient under the facts of a case to establish a manufacturing defect for purposes of liability under the LPLA." Jurls v. Ford Motor Co., 752 So.2d 260, 266(La.App. 2 Cir. 1/6/00); *See also* Joseph v. Bohn Ford, Inc., 483 So.2d 934, 940 (La. 1986). Louisiana imposes liability on the manufacturer of an unreasonably dangerous product when the characteristic of that product, which renders it unreasonably dangerous, proximately causes the complained of injuries. La.R.S. § 9:2800.54(A). A plaintiff must prove not only causation in fact, but also that the product defect was "the most probable cause" of the injury. Wheat v. Pfizer, Inc. 31 F.3d 340, 342 (5th Cir. 1994); Brown v. Parker-Hannifin Corp., 919 F.2d 308, 311 and n. 9, 312 (5th Cir. 1990). Mere proof that a particular occurrence possibly caused a defect should not be determinative of an issue of fact. Todd v. State, through Social Services, 699 So.2d 35, 43 (La. 1997). However, if "it is established with reasonable certainty that all other alternatives are impossible," such possibilities may be sufficient to establish causation. Id. It was the duty of the district court, as fact finder, to determine whether the totality of the evidence, either direct or circumstantial, was sufficient to show that the fact or causation sought to be proved was more probable than not. Based on

9

the record, the district court did not err in its determination that it was more probable than not that the contacts were welded together during the manufacturing and/or testing process.

A major contention between the parties was whether the switch was "on" or "off" at the time of the accident. The district court's ultimate determination of causation rested on this issue.[2] Hubbell's position that the contacts were welded together at the time of the accident was dependent on the switch being in the "on" position. Hubbell's specifications require the switches to be installed the European way: toggled down while "on" and toggled up while "off". Hubbell contends that the switch was toggled down but in the "on" position. The district court concluded that the switch was toggled down in the "off" position based on the testimony of several witnesses. We agree. The switches were not installed in the European way. They were installed the American way: toggled up for "on" and toggled down for "off". Both Woodling and Bill Garland testified that they installed the switches the American way not realizing the specifications required them to be installed the European way. Because the district court determined that the switches were off, Hubbell's causation theory cannot succeed.

---

[2] The district court stated: "[m]y understanding of the defense theory of the melting of the contacts occurring at the time of the accident, that that required the switch to be, in fact, in the on position, and since my finding of fact is that it was, in fact, in the off position, then the defense theory goes by the wayside as a result of that."

## C. Allocation of Fault

Hubbell submits that the district court's allocation of 70% fault to it was clearly erroneous. It argues that the evidence clearly demonstrated that Woodling's own negligence caused the accident. Had he turned the circuit breaker off before commencing the wiring and tested the switch with the voltage tester, the accident would have been prevented. Woodling as well as other witnesses at trial testified that, had he followed the safety procedures, the accident probably would have been avoided.

The district court's allocation of fault is a finding of fact and will not be set aside unless clearly erroneous. Fed.R.Civ.P. 52(a). Due regard is owed to the district court in judging the credibility of the witnesses. <u>Tokio Marine & Fire Ins. Co., Ltd. v. FLORA MV</u>, 235 F.3d 963, 970 (5th Cir. 2001). The district court found Woodling's comparative negligence to be 30%. This allocation of fault was based on Woodling's failure to use a voltage tester as required by the safety manual to determine whether the wire was live. The court did not, however, allocate fault for Woodling's failure to disengage the circuit breaker before beginning the wiring work. It is with this determination that Hubbell takes exception.

The district court did not allocate fault for disconnecting the circuit because it found, as a practical matter, that Woodling was not in a position to disconnect the circuit breaker which was providing electricity to other areas of the platform. Hubbell

11

argues that this conclusion was not supported by the evidence and that it was in fact possible for Woodling to disengage the circuit before commencing work. SECO's safety procedures require employees to lock out or tag out the electricity when working on a particular line. To tag out a line is the equivalent of placing a "do not operate" sign on it to ensure that the line is not turned on. However, Craig Duplantis, a senior superintendent with SECO, testified that it is not necessary to tag out a switch when it is visible and another person is monitoring it. There was a competent person standing by the switch during the installations which was the equivalent of a tag out. Additionally, the work was performed in a room where the door was closed precluding the possibility that the switch could have accidentally been turned on. The switches had been installed that morning by Woodling and Garland. They assumed that the switches were off, and it was safe to proceed. While safety procedures mandated turning the circuits off before commencing wiring, the facts indicated that safety procedures were in place, although concedingly not the most effective. Under the facts of this case, the district court did not clearly err in its allocation of fault.

AFFIRMED.

12