687 So.2d 124 (1996)
Reynold TERREBONNE and Geraldine Terrebonne,
v.
GOODMAN MANUFACTURING CORPORATION.
No. 96-CA-450.
Court of Appeal of Louisiana, Fifth Circuit.
December 30, 1996.
*126 Richard L. Ducote, New Orleans, for Plaintiffs-Appellees.
Scott G. Jones, New Orleans, for Defendant-Appellant.
Before GAUDIN, DUFRESNE and GOTHARD, JJ.
DUFRESNE, Judge.
This is an appeal by Goodman Manufacturing Corporation, defendant-appellant in this "defective design/failure to warn" action. Reynold Terrebonne, plaintiff-appellant, suffered a head injury when a packing strap on which he was tugging broke, causing him to fall off the side of a stationary truck. A jury awarded him 1.4 million dollars, reduced by 30% due to his own comparative fault. For the following reasons, we affirm that award.
The facts of the incident are these. Reynold Terrebonne had been employed for almost 20 years by Richard Brown, Sr., his father-in-law, in an air conditioning business. On June 7, 1990, plaintiff and Richard Brown, Jr. were preparing to go out on an installation job, and had loaded a utility type pick-up truck with heating and cooling units toward the front and ductwork and other equipment toward the rear. Before setting out, plaintiff realized that he had forgotten to get the serial number of a Goodman furnace for the inventory list. Because of the load, he was apparently unable to squeeze himself into any place in the truck from which he could see the number. Rather than partially unload the truck, he climbed up onto one of the side panel tool compartments to try to get the information from above. In a photograph admitted into evidence, Richard, Jr. demonstrated plaintiff's position on the tool compartment when he last saw him. The photograph shows that the top of the tool compartment is about as high as the top of the truck's cab, is about a foot wide, and has a pipe railing running along the outside edge about six inches from the top surface of the compartment. Plaintiff was standing on the inside of the rail with his heels toward it, and apparently fell backwards and head first to the ground.
Because of the injury to his head, plaintiff has no recollection of any of these events. Richard, Jr. testified that he saw plaintiff get up onto the truck and start pulling on a plastic type packing strap on the furnace to lean it over so he could get the number. At that point, he went into the shop and saw nothing further. When he heard hollering he came out of the shop and saw plaintiff on the ground. Kenneth Brown, Richard's brother, similarly testified. He said he saw plaintiff up on the truck pulling on the strap, and turned away. He heard a thud and when he looked back he saw plaintiff on the *127 ground a few feet from the truck. He immediately went to him and called for help.
Richard, Jr. also testified that after plaintiff had been taken to the hospital by ambulance, he looked in the truck and found that the packing strap on the Goodman unit was broken. He said that the break was not at the joint where the strap had been crimped, but rather along a straight run. He said he saw no reason then to keep the strap and so threw it away.
Plaintiff was taken to the hospital where he remained for four days. There was general agreement that upon admission he was incoherent and unable to recognize family members. The diagnosis at the time was that he had suffered a brain concussion, and a concussive injury to his left inner ear. At the time of trial in 1995, he was still being treated for almost constant headaches, dizzy spells, and personality and sexual disorders, all of which have effectively destroyed his relationships with his wife, step-children and friends.
Plaintiff sued Goodman, alleging basically that the design of the packaging used on the furnace was dangerous in that it was foreseeable that someone would use the strap to lift or move the unit, and that it might break and cause injury. He also alleged that Goodman knew, or should have known of this condition, but failed to warn users of this potential danger. A jury answered affirmatively a compound jury interrogatory which asked whether Goodman had breached its duty to plaintiff by either improperly designing the package or by failing to warn of its dangers. It awarded plaintiff the following items of damages:

General damages $875,000.00
Past medical expenses 57,000.00
Future medical expenses 98,000.00
Past and future earnings 380,000.00
Loss of society (to wife) 90,000.00

These amounts were reduced by 30% due to plaintiff's comparative fault. The final judgment also included a reimbursement to the workers' compensation carrier of $114,663.71. Goodman now appeals.
The appellant asserts eight errors in the district court. In four of these, it contends basically that the jury was manifestly wrong in finding that the packaging was defective or that any warning was necessary; in a fifth assignment, it asserts that plaintiff should have been found 100% at fault; in a sixth, it contends that the trial judge erred in permitting numerous family members and friends to give cumulative testimony about plaintiff's pre- and post-accident conditions; and in the last two, it argues that the awards for general damages, future lost wages, and future medicals are excessive.
We take up the defective design/failure to warn questions first. The Louisiana Products Liability Act, La. R.S. 9:2800.51 et seq., sets forth the responsibilities of manufacturers who place goods into trade or commerce. Section 2800.54, imposes liability on a manufacturer when, upon leaving its control, its product is unreasonably dangerous because of its 1) construction or composition, 2) design, 3) lack of adequate warnings of dangers, or 4) failure to conform to express warranties, and the resulting injury arose from a reasonably anticipated use of the product. Sections 2800.56 and 2800.57, define defective design and failure to warn, respectively, and sec. 2800.57, also provides that a warning is not necessary if the ordinary user or handler would appreciate the danger, or if the user or handler knows or should know of the danger.
The facts concerning these issues are as follows. The furnace involved here appears from the photographs in evidence to be an upright piece of equipment about 18 inches square and perhaps four to four and one half feet high. Its weight was estimated at 150 pounds. Malcolm Southern, the Goodman employee who designed the packaging for the furnace, testified by way of deposition. He explained that this packaging consists of top and bottom heavy cardboard caps, and four "L" shaped cardboard corner protection pieces. The design is such that the furnace is placed on the bottom cap and the corner protection pieces are placed along the upright corners and slipped down into the corners of that cap. Next, the top cap is fitted over the four corner protection pieces and the top of the furnace. Southern said that originally the entire package was wrapped in clear plastic sheeting. Occasionally, however, *128 the sheeting would tear, thus allowing the top cap to come off. When that happened, the corner protection pieces would simply fall away. To remedy this problem, a plastic strap was wrapped vertically around the unit to hold the top and bottom caps together and thus maintain the integrity of the packaging. When asked about the possibility that these straps would be used in handling the units, he said that no consideration was given to this question. He also stated that he never considered the safety implications of the design, but rather only its usefulness in protecting the unit during shipping and handling.
The strapping used on the package was manufactured by Signode Corporation. Ricky Moore, Signode's plant manager, testified that this strapping has a breaking point of 360 pounds, but can potentially be weakened by bending at corners, or from nicks and abrasions caused by handling. He noted that it was not designed to be used for pulling or lifting loads, and identified Signode's packaging of this product which carried warnings against such uses. He also said that Signode had shipped over 100 pallets of the strapping to Goodman over the last few years, and that the cardboard shroud on each pallet exhibited these warnings.
There was further testimony from Richard Brown, Sr. and his two sons, Richard, Jr. and Kenneth, to the effect that they regularly used the strap as a "handle" to move the Goodman units, obviously because the position of the strap made such use almost inevitable. Richard, Jr. said that he had never had a strap break on him, and that many times he had tried to break the strap by hand when he had forgotten his knife, but to no avail. Kenneth said that on one occasion a strap had broken, but he did not tell anyone about the incident.
On these facts, the jury determined that Goodman was liable for the accident. As noted above, the jury interrogatory asked alternatively whether there was a defect in design or a failure to warn of a danger, and the jury answered affirmatively. Although we are thus unable to say with certainty which finding it made, given the evidence outlined above, it is evident to this court that the failure to warn was most likely what the jury based its ultimate decision on. In any case, Goodman argues here that this result was wrong.
Because the error complained of here was a factual one, the standard of appellate review is whether the finding was manifestly erroneous. In Stobart v. State through DOTD, 617 So.2d 880 (La.1993), the court reiterated that application of the "manifest error" standard involves a two part inquiry for reversal of a factual finding. The court must first determine that a reasonable factual basis does not exist for the trial court finding. The court must then further determine that the entire record establishes that the finding is clearly wrong.
In the present case, the evidence as a whole shows that there is a reasonable factual basis to support a finding that the product was defective due to a failure to warn about using the strap as a "handle." The jury heard testimony from Ricky Moore of Signode that the straps should not be used to lift or move loads, and that Signode places such a warning on all of the packages of strapping that it sells. Malcolm Southern, Goodman's package designer, was apparently unaware of these warnings, and indeed testified that the potential danger of the strap's positioning was never even considered in the design of the package. This testimony clearly constituted a reasonable basis upon which the jury could find that the package was dangerous when used in certain ways, and that Goodman's failure to warn about such uses rendered it liable to plaintiff for the resulting injury.
Goodman argues further, however, that even were there some danger in the package design, it was nonetheless a danger which should have been obvious to the ordinary user, and certainly should have been known to plaintiff, an admittedly experienced handler of such equipment. Again, this is a factual question which the jury answered in plaintiff's favor. There was testimony by plaintiff's coworkers that they had used the strap as a "handle" on numerous occasions, and only once had one broken. Plaintiff *129 testified that a strap on another type of packaging had once broken on him, but never a strap on a Goodman unit. The jury's apparent finding that the danger was not so obvious as to have been appreciated by either an ordinary or an experienced handler is a reasonable one considering the above testimony, and we are therefore precluded from setting that finding aside.
Goodman next urges that the jury erred in finding plaintiff only 30% at fault in bringing about his own injuries. Percentages of comparative fault are factual determinations, and therefore the manifest error standard of review is applicable in this context also, Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967 (La.1985). In the above case, the court set forth a number of factors which are to be considered in the comparative fault context. After noting the general scope of the inquiry into the nature of the conduct of the parties and the extent of the causal relationship between the conduct and the damages, the court went on to say:
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties. At 974.
In the present case, the evidence showed that plaintiff got up on the side of the truck and began tugging on the strap, at which point it broke, causing him to loose his balance and fall. The warnings provided by Signode gave notice that injury might result if the strap broke while being used to lift or move loads. This warning clearly was directed to situations in which a handler would loose his balance and fall upon the sudden breaking of such a strap. That is precisely what happened here. On the other hand, it is equally evident that it would not be expected that a handler would place himself in so precarious a position that failure of the strap would have such devastating results.
The entire record of this case shows that the jury had a reasonable basis upon which to conclude that plaintiff was partially at fault in bringing about his injuries. It further shows that the apportionment of fault at 70% to defendant and 30% to plaintiff was founded in a reasonable assessment of the evidence. It is apparent that the failure of Goodman to simply pass on the warning given it by Signode was viewed by the jury as the most egregious conduct leading to the accident. It is equally apparent that the jury considered the dangerous position in which plaintiff placed himself, as well as his decision to climb up on the truck, rather than follow the more arduous and time consuming, but safer, course of unloading some of the materials to reach the unit, and concluded that he too was at fault, but to a lesser degree. In these circumstance, we conclude that the apportionment of fault found by the jury was a reasonable in light of the entire record. While we might well have ascribed to plaintiff a somewhat higher percentage of fault had we been sitting as triers of fact, that consideration is irrelevant. The only proper question is whether in light of the entire record the jury's finding was manifestly erroneous. Having determined that it was not, we must affirm the jury's apportionment of comparative fault.
The next issue presented concerns the trial judge permitting some twelve relatives and friends of plaintiff to testify about his pre- and post-accident conditions. Goodman does not assert that this testimony was irrelevant, and therefore inadmissible under La. C.E., Art. 402. Its argument is, instead, that the prejudicial effect of the evidence outweighed its probative value, and therefore that it should have been excluded pursuant to Art. 403. Trial judges are given wide discretion in ruling on evidentiary matters, and such rulings will be disturbed on appeal only when there is a clear showing that there has *130 been an abuse of that discretion which has prejudiced substantial rights of a party, La. C.E., Art. 102; see also Fisher v. River Oaks, Ltd., 93-677 (La.App. 5th Cir. 3/16/94), 635 So.2d 1209.
In the present case, the defense attempted to show that plaintiff was a malingerer and that he was grossly exaggerating his symptoms. To substantiate these allegations, it called five medical and psychological experts to so testify. Because of the number of such witnesses, the plaintiff deemed it prudent to call family and friends to testify about their experiences with him, all of which gave support to his credibility. The trial judge was in the best position to determine whether this evidence was so cumulative as to prejudice the defense, or whether it was appropriate under all of the circumstances of the case. Our examination of the record discloses nothing which would remotely constitute an abuse of discretion in the trial judge admitting this relevant evidence, and we therefore must uphold the trial judges ruling to admit the testimony.
The last two issues concern quantum. As to special damages, Goodman's position is that the evidence did not establish that plaintiff is totally disabled and therefore that the award for future lost wages is without foundation. It further argues, in effect, that if plaintiff is not disabled then he has no condition for which he needs future medical treatments and therefore the award for future medicals is also without foundation. Because the awards of both of these elements of special damages are based on factual findings, the "manifest error" standard of review is applicable here as well.
Defendant's economic expert testified that if plaintiff is indeed totally disabled, then his loss of future earnings would be about $344,000.00. Plaintiff's expert offered a range of $422,000.00 to $450,000.00, for this item. The jury awarded $380,000.00. Obviously, if plaintiff is indeed totally disabled from gainful employment, the award is adequately supported even by defendant's expert. The inquiry here is thus whether the jury was clearly wrong in obviously finding total disability. Aside from the malingering question, which the jury clearly resolved in plaintiff's favor, Goodman argues that even plaintiff's treating physicians were not in agreement as to whether he is totally disabled. While appellant somewhat overstates some of the conflicting opinions, the problem revolves around the fact that plaintiff's cognitive or reasoning skills have not been significantly impaired, but his emotional stability has been seriously damaged.
A brain injury specialist and neuro-psychologist, Dr. Michael Howard, examined plaintiff at length, administered numerous tests over a two day period, and determined that in his opinion he was definitely not malingering. His diagnosis was post-concussion syndrome, marked by personality changes, sexual dysfunction, and persisting headaches. He gave a good prognosis for eventual recovery if the pain from the headaches could be controlled. If not, then the prognosis was poor. His opinion as to disability was that plaintiff has no cognitive defects which would prevent him from working, but because of his emotional problems he should avoid any stressful types of work.
Plaintiff's treating psychiatrist, Dr. Candice Cutrone, had seen him over 80 times by the time of trial. Her diagnosis was a mood disorder with depression and explosive personality traits, secondary to trauma. Her emphatic opinion was that plaintiff could not function in a work setting because of his emotional instability, and might well be dangerous to himself or co-workers in the workplace. Similarly, Dr. Mark Rosenblum, a physical medicine and rehabilitation specialist at the Touro Rehabilitation Center, was of the opinion that because of the chronic pain problem, plaintiff can not work and that a return to employment in the future was unlikely. Dr. D.C. Mohnot, a neurologist, also examined plaintiff on several occasions. His diagnosis was post-concussion syndrome with dizziness and vertigo, sexual dysfunction, and personality disorders involving irritability. Dr. John Kimble, an eye, ear, nose and throat specialist, saw plaintiff a few weeks after the accident and test results confirmed a concussive injury to the left inner ear. Almost a year after the accident this doctor found the dizziness persisting, which he thought unusual but not impossible.
*131 Although neither of the last two physicians gave any opinion on disability, they did nonetheless confirm plaintiff's complaints.
Richard Brown, Sr. testified that he had given plaintiff work in the warehouse and office after the accident, but that he could not perform. He said that plaintiff could not concentrate on the tasks at hand, got distracted, and took hours to do simple tasks. He said that this trial employment simply did not work out. Other members of plaintiff's family also testified about his ability to work. Most noted that they had tried working with him from time to time on house repairs and other small projects, but that he often became belligerent in the middle of the job. They also reported that he had dizzy spells and sometimes fell down during the work.
It is obvious to this court that Dr. Howard was probably correct in his opinion that plaintiff's cognitive abilities have not been seriously damaged. However, it is equally apparent that the disabling condition arises instead from the personality disorder and the continuing headaches and dizziness. As to the severity of that condition, there was ample medical opinion to substantiate a finding of total disability. Further, if plaintiff's relatives are believed, as they obviously were by the jury, then a factual determination of total disability is a reasonable one in the context of the entire record. That being so, the award for future lost wages based on total disability must be affirmed.
As to the future medicals, Goodman's position, as best we can make out from briefs, is not that the costs of future medicals as testified to by several doctors was incorrect. Rather, its argument seems to be that no such treatments are needed because there is nothing medically or psychologically wrong with plaintiff. This argument depends, of course, on belief in the opinions of the various defense experts called by Goodman to the effect that plaintiff is a malingerer. However, as already shown, the jury evidently rejected these opinions, and instead accepted those advanced by plaintiff's experts. Because we have determined that there was no manifest error in these factual determinations by the jury, then the award of future medicals based on these findings must likewise be affirmed.
The last issue is whether the general damage award was excessive. The standard of review of general damages is whether the court abused its much discretion in fixing this award, The jurisprudence on this standard was most recently reviewed in Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993). There, the court set forth the long-standing general rule that the role of an appellate court is not to decide what it considers an appropriate award, but rather to review the exercise of discretion by the trier of fact, It went on to reiterate that consideration must first be given to the particular injuries and their effects in the particular circumstances of the particular plaintiff. Only if an appellate court determines, for articulable reasons distinct to the case at hand, that the trier of fact abused its discretion it may set aside an award as either too high or too low. The court went on to say that:
The standard for appellate review of general damage awards is difficult to express and is necessarily non-specific, and the requirement of an articulated basis for disturbing such awards gives little guidance as to what articulation suffices to justify modification of a generous or stingy award. Id., at 1261.
In the present case, all of these difficulties are compounded because of the nature of plaintiff's injuries. In a more typical personal injury case, such as Youn, supra, there are usually specific elements of the injury which can be looked to in formulating an award, such as the severity of the injury, the extent of medical treatments, the length of treatments, any residual physical problems, and then, of course, the more nebulous questions of pain and suffering during the incident and thereafter. In the instant matter, plaintiff's major injury is a mental one. His actual hospitalization lasted only four days, and although he underwent subsequent testing and psychiatric treatments, few of these occasioned any physical pain. His persisting physical problems are chronic headaches and occasional dizziness, and while we do not deprecate the seriousness of these symptoms, *132 they do not, in our opinion, constitute the most significant part of his damages.
What the evidence establishes is that plaintiff's most serious injury is his apparent loss of his own personality. Both the medical and lay testimony showed that plaintiff is now moody, irritable, withdrawn and has suicidal thoughts brought on by feelings of guilt and frustration. He is also sexually dysfunctional. His wife testified that prior to the accident he was a loving, tranquil and thoughtful person to whom she could go to for comfort and understanding. She said he is now so changed that she does not know him and she only stays married to him out of a sense of obligation to the person that she married. Several of his wife's children by a prior marriage, who were raised by plaintiff as his own, testified similarly. All of them, as well as their spouses, said that he had been an easy-going, caring person who would do anything to help them, but that he had now become a totally different man in that he was difficult to get along with and very distant with them. Several of plaintiff's medical experts stated that his condition was a medically recognized syndrome associated with closed head brain injuries.
Based on all of this evidence, the jury determined that an award of $875,000.00, was appropriate for general damages. Although this amount is probably at the upper limits of what a reasonable trier of fact might have awarded, we are unable to articulate any basis upon which to conclude that it constitutes an abuse of the jury's "much discretion" in fixing the award. We therefore must affirm that award.
For the foregoing reasons, the judgment of the trial court is hereby affirmed.
AFFIRMED.