783 So.2d 599 (2001)
Dale CLAVIER, et al.
v.
Kenneth J. ROBERTS, et al.
No. 00-1666.
Court of Appeal of Louisiana, Third Circuit.
April 4, 2001.
Rehearing Denied May 10, 2001.
*602 Patrick C. Morrow, Sr., James S. Gates, Morrow, Morrow, Ryan & Bassett, Opelousas, LA, Counsel for Plaintiffs/Appellants: Dale Clavier, Debra Clavier, Jordan Debra Clavier.
Thomas E. Gibbs, Thomas E. Gibbs & Associates, Baton Rouge, LA, Counsel for Defendants/Appellees: U.S. Agencies Casualty Insurance Company, Inc., Kenneth J. Roberts.
Paul H.F. Baker, Law Offices of Nan M. Landry, Lafayette, LA, Counsel for Defendants/Appellees: American Central Insurance Company, Albert Hardy, Holly Hill, L.L.C.
Kenneth E. Pickering, Mark T. Hennen, Pickering & Cotogno, New Orleans, LA, Counsel for Defendants/Appellees: Gussie Malbrough, National Automotive Insurance Company.
Preston D. Cloyd, Cloyd, Wimberly & Villemarette, Lafayette, LA, Counsel for Defendant/Appellee: State Farm Mutual Automobile Insurance Company.
Court composed of DECUIR, SULLIVAN, and PICKETT, JJ.
SULLIVAN, Judge.
Dale, Debra, and Jordan Clavier appeal the judgment of the trial court which dismissed their claims against Albert Hardy, awarded damages in amounts that they claim are inadequate, and dismissed their claims for uninsured motorist (UM) coverage. For the following reasons, we affirm in part, reverse in part, and render.

Facts
On April 17, 1998, a three car accident occurred on Cresswell Lane in Opelousas, Louisiana. Jordan Clavier, a minor at the time, was severely injured in the accident. Jordan and his parents, Dale and Debra, filed suit against Kenneth Roberts, Albert Hardy, Gussie Malbrough, and their insurers to recover damages for Jordan's injuries. In June 2000, the matter was tried before a jury, which rendered judgment in favor of the Claviers against Kenneth Roberts and his insurer, U.S. Agencies Casualty Insurance Company, for damages in the following amounts for Jordan:

Physical pain and suffering $ 30,000.00
Mental pain and suffering 5,000.00
Past medical expenses 29,534.00
Future medical expenses 2,500.00
Future loss of earnings/loss of earning -0-
capacity
Disfigurement and physical disability -0-
Loss of enjoyment of life -0-

Dale and Debra were each awarded $2,000.00 for loss of consortium.
On appeal, the Claviers assign five errors:
1. The jury's failure to allocate fault against Albert Hardy.
2. The jury's failure to award damages for loss of enjoyment of life, disfigurement, physical disability and future loss of earnings/loss of earning capacity, as well as the minimal $2,500.00 future medical expense award and the minimal $35,000.00 general damages award.
3. The award to Dale and Debra of $2,000.00 for loss of consortium was inadequate.
4. The jury's finding that Dale validly rejected UM coverage on Jordan's vehicle.
5. This court's prior decision that a policy of automobile insurance issued *603 by State Farm Mutual Automobile Insurance Company in favor of the Claviers for vehicles other than Jordan's did not provide UM coverage to Jordan.

Standard of Review
A jury's finding of fact may not be reversed absent manifest error or unless clearly wrong. Stobart v. State, Through Dep't of Transp. and Dev., 617 So.2d 880 (La.1993). "[A] reviewing court must do more than simply review the record for some evidence which supports or controverts the trial court's findings. [It must instead] review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous." Stobart at 882. "[T]he issue to be resolved ... is not whether the trier of fact was right or wrong, but whether the fact finder's conclusion was a reasonable one." Id. The reviewing court must always keep in mind that "if the trial court or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Stobart at 882-83.

Law of the Case
The Claviers assign as error a prior ruling by this court that a policy of insurance issued by State Farm, insuring two vehicles, neither of which was Jordan's, did not provide UM coverage to Jordan for his injuries. See Clavier v. Roberts, 99-1070 (La.App. 3 Cir. 12/29/99); 755 So.2d 977, writ denied, XXXX-XXXX (La.3/24/00); 758 So.2d 152.
In Ducote v. City of Alexandria, 97-947, p. 3 (La.App. 3 Cir. 2/4/98); 706 So.2d 673, 674-75, writs denied, 98-1061, 98-1070 (La.5/29/98); 720 So.2d 671, we discussed the law of the case doctrine, stating:
The law of the case doctrine "recognizes the binding force of trial court rulings during later stages of the trial...." Pitre v. Louisiana Tech University, 26,388, p. 1 (La.App. 2 Cir. 5/10/95); 655 So.2d 659, 664, writs granted, 95-1466, 95-1487 (La.10/6/95); 661 So.2d 454, reversed on merits, 95-1466, 95-1466 (La.5/10/96); 673 So.2d 585; see also Day v. Campbell-Grosjean Roofing & Sheet Metal Corp., 260 La. 325, 256 So.2d 105 (1971). The reasons for this doctrine are: (1) avoidance of indefinite litigations; (2) consistency of results in same litigation; (3) essential fairness between the parties; and, (4) judicial efficiency.

Johnson v. Acadiana Ry. Co., 96-263 (La.App. 3 Cir. 4/16/97); 693 So.2d 226, 228-29. See also Louisiana Land and Exploration Co. v. Verdin, 95-2579 (La. App. 1 Cir. 9/27/96); 681 So.2d 63, writ denied, 96-2629 (La.12/13/96); 692 So.2d 1067, cert. denied, 520 U.S. 1212, 117 S.Ct. 1696, 137 L.Ed.2d 822 (1997). It is true that "[t]he doctrine is discretionary and should not be applied where it would effectuate an obvious injustice or where the former appellate decision was clearly erroneous." Trans Louisiana Gas Co. v. Louisiana Ins. Guar. Ass'n, 96-1477 (La.App. 1 Cir. 5/9/97); 693 So.2d 893, 896.
The Claviers' arguments on this assignment have previously been considered by this court. On appeal, their arguments are the same. Finding no error or injustice in our prior decision, we will not reconsider it.

Negligence of Albert Hardy
The Claviers argue that the jury erred in failing to assess negligence to Mr. Hardy. The accident at issue occurred *604 when Kenneth Roberts changed lanes in an attempt to avoid an accident with a vehicle driven by Gussie Malbrough. Ms. Malbrough and Mr. Roberts were traveling in a westerly direction in the outside lane of Cresswell Lane; Ms. Malbrough was in front of Mr. Roberts. Ms. Malbrough testified that she turned off of Cresswell Lane into a shopping center after she was startled by something that flew up from the road in front of her. Mr. Roberts testified that Ms. Malbrough stopped dead in the roadway without warning, and he moved into the inside lane to avoid hitting her. He further testified that, before changing lanes, he checked the traffic in his rear-view mirror to see if he could change lanes safely; he saw Mr. Hardy's truck and believed he had time to make the lane change. As he changed lanes, Mr. Roberts sideswiped Mr. Hardy whose truck was propelled out of his lane of travel into oncoming travel. Mr. Hardy hit Jordan head-on.
The Claviers contend that, according to Mr. Hardy's own admissions, he could have avoided the accident if he had driven defensively and either slowed down or sped up to allow Mr. Roberts to safely change lanes. The Claviers and Mr. Hardy each had an accident reconstructionist testify at trial. The experts agreed that there was nothing Mr. Hardy could have done after he was hit by Mr. Roberts to avoid hitting Jordan. However, the Claviers' expert testified that Mr. Hardy had time to perceive the danger presented to Mr. Roberts and to react in a manner which would have allowed Mr. Roberts to change lanes safely, i.e., slow down or speed up. Mr. Hardy's expert disagreed, testifying that there was nothing defensive driving could have done to avoid the accident.
Mr. Roberts and Mr. Hardy testified at length on direct and under cross-examination as to what occurred prior to the accident. Both experts testified regarding their opinions and the bases of those opinions. Each was thoroughly cross-examined by opposing counsel. The jury viewed photographs and a video of the accident scene, as well as a scale drawing of the accident in conjunction with the testimony of various witnesses. Thus, the jury had the opportunity to view the parties and their experts and weigh their testimony and the physical evidence.
The jury's determination is supported by the record. To reverse the jury's determination of fault would be to substitute our determination for its determination. This assignment of error is without merit.

Rejection of UM Coverage
State Farm denied UM coverage under the policy it issued on the car driven by Jordan at the time of the accident because it had a UM selection form signed by Mr. Clavier rejecting UM coverage. Mr. Clavier testified that the signature on the form was his handwriting, but the date and initials indicating a rejection of UM coverage were not. Mr. Clavier introduced his payroll records which indicated that he was at work in Geismer, Louisiana, on November 6, 1997, the date on the selection form. Ignatius Castille, Mr. Clavier's insurance agent, testified that it was State Farm's strict policy at the time Mr. Clavier signed the selection form that such forms had to be initialed and signed by the insured and that he and his office staff abided by that policy because failure to do so could cost him his job. Mr. Clavier testified that the initials on the selection form were not his; Mr. Castille testified that neither he nor his staff would initial a UM selection form for a customer. Thus, the jury was faced with determining which of the gentlemen's testimony was more credible.
*605 In Rosell v. ESCO, 549 So.2d 840, 844-45 (La.1989) (citations omitted), the supreme court stated, in part:
When findings are based on determinations regarding the credibility of witnesses, the manifest errorclearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. But where such factors are not present, and a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong.
The jury chose to believe Mr. Castille. While Mr. Clavier's payroll records reflect that he was working the day on which the UM selection form was dated, Mr. Castille explained that Mr. Clavier was not required to go into his office to sign the form and it may have been dated by one of his employee's as a convenience to Mr. Clavier. Mr. Clavier testified that Jordan brought the car to Mr. Castille's office to have it photographed as required by State Farm. The jury could have concluded that Jordan brought the selection form home for his father to initial and sign and that Mr. Castille's office personnel dated the form, either before sending it with Jordan or after receiving it back at the office.
The Claviers attempted to discredit Mr. Castille's explanation regarding the date on the selection form; however, Mr. Castille provided an explanation as to why the date on the form was not in Mr. Clavier's handwriting. With regard to the initials, the jury simply had to determine who it believed. Based upon the evidence presented on this issue, we find no manifest error with the jury's conclusion. This assignment is without merit.

Jordan's Damages
The assessment of damages is a determination of fact which is entitled to great deference on review. The record must reveal that the jury abused its discretion before it can be disturbed on appeal. Coco v. Winston Indus., Inc., 341 So.2d 332 (La.1977). As such, "the role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact." Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1260 (La.1993).
Jordan injured his head and his left arm in the accident; he also had scrapes and bruises on other parts of his body. The injury to his left elbow was serious. One bone in his forearm was broken and a portion of that bone jutted out from his skin; the other bone in his forearm was dislocated. Emergency surgery was required to repair the injury. Due to the injury to his head, clearance had to be obtained from a neurosurgeon before the orthopedic surgeon on call could proceed with surgery. Jordan was hospitalized for two and one-half days.
Expert testimony established that elbow injuries like Jordan's are prone to a common complication known as heterotrophic ossification (HO). HO is a condition where parts of soft tissue turn to bone. It can cause severe stiffness in joints. To avoid the likelihood of HO occurring in Jordan's elbow, the attending orthopedic surgeon recommended, and Jordan received, radiation *606 therapy within forty-eight hours of his injury. While there are risks associated with radiation, the benefits of the radiation are considered to outweigh the risks. Minimal HO developed in Jordan's left elbow and his treating physician, Dr. Neils Linschoten, an orthopedic surgeon, testified that there was no threat of greater development of HO at the time he was released from active care.
Jordan's course of treatment and recovery for his elbow were unremarkable. During his course of treatment, Dr. Linschoten restricted him from pushing, pulling, heavy lifting, and forceful use of his lower left extremity. On July 16, 1998, Dr. Linschoten felt that Jordan was progressing well, but was not at maximum medical improvement, explaining that it takes several months to regain a full range of motion with an injury like his. While Dr. Linschoten recommended that Jordan return to see him in three months, he did not return until April 12, 1999, when he reported that he was doing great until he hit his elbow, causing it to become painful and swollen. At that time, Dr. Linschoten found that his range of motion in the elbow was nearly full and was limited only by the pain and swelling which resulted from the bump he complained of. At that visit, removal of the hardware used to hold the fractured bone in place was recommended. Two days later, on April 14, 1999, the hardware was removed during an outpatient procedure. Jordan's last visit with Dr. Linschoten was May 4, 1999. At that time, the doctor expected Jordan to regain full functional capacity in his left elbow, even though he had not yet regained a full range of motion of the elbow. Dr. Linschoten explained that Jordan may never have full extension of his elbow, but that does not typically interfere with its function. In Dr. Linschoten's opinion, Jordan's elbow injury would not inhibit his exercise of any profession, although he did acknowledge that he may have mild pain occasionally if he does strenuous work.
Dr. Linschoten, whose deposition was taken October 8, 1999, noted that Jordan's record reflected that he had seen a primary care physician in his medical group in July 1999. Notes for that visit indicated that Jordan was anxious to resume normal weight-lifting, and Dr. Linschoten testified that he saw no problem with him doing so. Dr. Linschoten testified that he would not place any physical restrictions on Jordan. In all, he believed Jordan was fully recovered some fourteen months after his injury.
Jordan had a cut above his right eye which was less than one-half inch long and required only a couple of stitches; it healed without problem. The hit on Jordan's head proved to be much more complicated than his other injuries.
A CAT scan was performed on Jordan's head in the emergency room, which revealed what has been described as minor and/or mild closed-head injury. There were differing opinions by experts as to whether Jordan had any intraventricular bleeding as a result of the accident. Intraventricular bleeding is not within the brain tissue itself, but occurs in the spaces where the spinal fluid is located in the brain. Dr. Horace Mitchell, a neurosurgeon to whom Jordan was referred for treatment after being dismissed from the hospital, noted that there was swelling on the outside of Jordan's skull when he saw him on May 27, 1998. He was of the opinion that the CAT scan did not evidence intraventricular bleeding and determined that Jordan did not have a brain injury. However, he was of the opinion that Jordan did have a closed-head injury and suffered from post-concussive syndrome.
While Dr. Mitchell found an MRI taken three months after Jordan's injury to be *607 unremarkable or normal, he explained that a normal MRI does not rule out a brain dysfunction. After determining that Jordan was not in need of surgery, Dr. Mitchell referred him to Dr. Susan Scarborough, a neurologist in his office, for further care. Dr. Scarborough ordered an EEG which she found to be mildly abnormal because of the presence of some mild slowing in the right upper portion of Jordan's brain. Her impression was that Jordan had a closed head injury with continued neurological problems evidenced by staring spells and memory loss related to her by Jordan's family. She felt that the headaches he complained of were post-concussive headaches. In September 1998, Dr. Scarborough determined that Jordan was doing much better; however, his father related that he would stop in the midst of a conversation and seem to be unaware of what was going on around him. When questioned, Jordan related to Dr. Scarborough that he had not noticed any problems with attention or concentration and was attending Louisiana State University without problems.
Dr. Scarborough sent Jordan for neuropsychological testing to evaluate his brain function. She wanted to determine whether he was suffering from a superimposed depression or true organic memory loss due to a neurologic condition. Dr. Paul Dammers, a neuropsychologist, administered the testing recommended by Dr. Scarborough. Dr. Dammers reported that he felt Jordan had some cognitive dysfunction, which Dr. Scarborough concluded was the result of an emotional dysfunction in the brain, rather than a physical dysfunction. According to Dr. Scarborough, a normal concussion would have resolved by September 1998. In her opinion, his continuing problems were caused by his head injury. She related the continued depression, social isolation, personality changes, and problems with control of his emotions, testified to by his parents and friends, to the head injury he sustained in the accident. Further, she testified that it was not unusual for a person who had a head injury to have a personality change.
Dr. Dammers explained that as a neuropsychologist he diagnoses and treats known or suspected brain related disorders, affecting both cognition, which is thought, as well as emotions and behavior. He testified that the most persistent and most problematic aspect of traumatic brain injury is the alteration in mood and personality of the injured person. This alteration often significantly alters the course of the person's life because it reduces the capacity to cope and changes the way he interacts with friends and family.

Future Medical Expenses
A plaintiff must show that it is more probable that not that future medical expenses will be incurred. Medical testimony should be required for such an award. Veazey v. State Farm Mut. Auto. Ins., 587 So.2d 5 (La.App. 3 Cir.1991). According to the undisputed testimony of numerous witness, the accident caused an alteration in Jordan's mood and personality which still existed shortly before trial. He was no longer the exuberant, happy young man he was before the accident. He became a loner, who no longer wanted to visit with family and friends as he had before the accident. He became verbally aggressive and his temper often flared, which was not characteristic of him. On the recommendation of Dr. Dammers, Jordan was prescribed Celexa, an anti-depressant medication, approximately six weeks before trial. Testimony established that his mood and personality improved after he began taking the drug. Most people with brain injury expect maximum recovery of function within one to one and one-half *608 years. Jordan's mood and personality had not returned to its pre-accident status by the time of trial, twenty-six months after the accident, and Dr. Dammers felt it was not likely to improve more than it already had. Because of this, he was of the opinion that Jordan would need medication for the rest of his life. He testified that Celexa costs $100.00 per month. Doug Womack, the Claviers' economic expert, projected the expense for the drug over Jordan's lifetime to be $61,936.00. Dr. Dammers also recommended that Jordan continue with counseling. In his opinion, Jordan would need counseling every two to three weeks while in school; thereafter, he hoped it would be needed less frequently. Pursuant to Dr. Dammers' testimony, Mr. Womack projected future counseling expenses would be $7,289.00.
The jury awarded only $2,500.00 in future medical expenses. Thus, it is clear that the jury did not accept the medical evidence that Jordan suffered a mental dysfunction and/or personality change as a result of the injury to his head. Defendants argued to the jury that Jordan's change in personality and mood was not caused by the injury to his head. Instead, they argued that the changes were part of the maturing process and progressing from a high school student to a college student.
While the jury apparently accepted Defendants' argument, its conclusion ignores the medical evidence. We find that the jury abused its discretion in not awarding an amount sufficient to provide Jordan with anti-depressant medication for the rest of his life. However, we do not find error in the jury's refusal to award the cost of counseling in light of the fact that Jordan did not regularly seek counseling prior to trial. Accordingly, we increase the award for future medical expenses to $61,936.00.

Pain and Suffering
The jury awarded Jordan $30,000.00 for physical pain and suffering (past and future) and $5,000.00 for mental pain and suffering (past and future). He asserts that these awards were an abuse of the jury's discretion, claiming the awards are insufficient for the injury to his elbow alone without considering the injury to his head and the resulting mental injury he suffered. As noted in our discussion regarding future medical expenses, we conclude that the jury did not award Jordan damages for the injury to his head and the resulting changes in his mood, personality, and cognitive abilities.
Jordan's recovery from his elbow injury required approximately fourteen months. After that time period, Dr. Linschoten released him without any restrictions. He was capable of returning to weight-lifting, a sport he greatly enjoyed. While Jordan had been released to return to weight-lifting at the time of trial, he did not testify that he had returned to the sport. Significantly, he did not testify that he attempted to return to the sport but was unable to because of pain. In the future, his elbow will not limit his participation in any profession or activity; however, he may suffer pain occasionally following strenuous work.
We conclude that the jury's award of $30,000.00 was within its discretion for Jordan's physical injuries. However, we find the jury's award of $5,000.00 for mental pain and suffering to be an abuse of its much discretion.
In Terrebonne v. Goodman Manufacturing Corp., 96-450, pp. 15-16 (La.App. 5 Cir. 12/30/96); 687 So.2d 124, 131-32, the court discussed the problem with a damage award in a case such as this:

*609 In the present case, all of these difficulties are compounded because of the nature of plaintiff's injuries. In a more typical personal injury case, such as Youn, supra, there are usually specific elements of the injury which can be looked to in formulating an award, such as the severity of the injury, the extent of medical treatments, the length of treatments, any residual physical problems, and then, of course, the more nebulous questions of pain and suffering during the incident and thereafter. In the instant matter, plaintiff's major injury is a mental one. His actual hospitalization lasted only four days, and although he underwent subsequent testing and psychiatric treatments, few of these occasioned any physical pain. His persisting physical problems are chronic headaches and occasional dizziness, and while we do not deprecate the seriousness of these symptoms, they do not, in our opinion, constitute the most significant part of his damages.
What the evidence establishes is that plaintiffs most serious injury is his apparent loss of his own personality. Both the medical and lay testimony showed that plaintiff is now moody, irritable, withdrawn and has suicidal thoughts brought on by feelings of guilt and frustration. He is also sexually dysfunctional. His wife testified that prior to the accident he was a loving, tranquil and thoughtful person to whom she could go to for comfort and understanding. She said he is now so changed that she does not know him and she only stays married to him out of a sense of obligation to the person that she married. Several of his wife's children by a prior marriage, who were raised by plaintiff as his own, testified similarly. All of them, as well as their spouses, said that he had been an easy-going, caring person who would do anything to help them, but that he had now become a totally different man in that he was difficult to get along with and very distant with them. Several of plaintiff's medical experts stated that his condition was a medically recognized syndrome associated with closed head brain injuries.
While Jordan was similarly affected by his head injury as the plaintiff in Terrebonne was, it was not as extensive. Furthermore, in Terrebonne, there was no indication that the use of medication had been implemented in an attempt to improve the plaintiff's personality and mood problems as with Jordan. Fortunately, medication improved Jordan's mood and affect; however, there is no evidence that the medication improved his concentration. Upon Dr. Dammers orders, Jordan has been given special consideration at LSU when taking tests, e.g., he has unlimited time to complete them. Additionally, he is provided with tutoring assistance for his class work. Undoubtedly, his impaired concentration will be a problem for the rest of his life; however, special consideration will not always be available to him. For example, his vocational expert testified that no special consideration would be made for him when taking an admission test to medical school or in class work in medical school.
Essentially, Jordan was not himself for two years following the accident. It appeared at the time of trial that medication improved his situation, and he was more like his old self. His problem with concentration has been compensated for at LSU, but the future is unknown in this regard. We conclude that $150,000.00 is an appropriate award for mental pain and suffering.

Future Loss of Earnings/Loss of Earning Capacity
Jordan, his family, and friends testified that he planned go to medical school and become a doctor. Jordan argues *610 that the brain dysfunction which resulted from his head injury dashed his dream of becoming a doctor and he seeks to recover damages for the loss of income he would have realized as a general practitioner or as a physician's assistant. His high school transcript reflects that his studies in high school were geared toward preparation for pre-med studies in college. Jordan entered LSU in the pre-med curriculum in August 1998. On cross-examination of Jordan's vocational rehabilitation expert, Mr. Hardy was able to show that even without this accident there was no guarantee Jordan would be accepted into medical school. The expert agreed that less than five percent of students who completed a pre-med curriculum are accepted into medical school and that, statistically, Jordan would not have made it.
Earning capacity is a person's potential to earn. The lost ability to earn a certain amount of income is what an award for loss of earning capacity compensates. Ford v. State ex rel. DOTD, 99-1297 (La.App. 3 Cir. 4/12/00); 760 So.2d 478, writs denied, XXXX-XXXX (La.9/27/00); 769 So.2d 1214; 00-1864 (La.9/29/00); 770 So.2d 350, 352. Consideration must be given to "whether and how much a plaintiffs current condition disadvantages him in the work force." Id. at 490. While Jordan attempted to show that his injuries cost him the opportunity to become a doctor or a physician's assistant, the evidence was such that the jury could have concluded that the likelihood of him being accepted into and completing medical school or physician assistant school was speculative and insufficient to carry his burden of proof. We find no error with the jury's failure to award damages for future loss of earnings or loss of earning capacity.

Disfigurement and Physical Disability
Jordan assigns as error the jury's failure to award damages for disfigurement and physical disability. Jordan appeared in court before the jury and pictures of the scars on his left elbow were viewed by the jury. We have reviewed the photographs and considered the size and coloring of the scars and where they are located. We find no error with the jury's failure to award damages for disfigurement.
Dr. Linschoten testified that, while Jordan would not regain full extension of his left arm, function of the arm was not affected. He did not assign any disability to Jordan's left elbow. We conclude the jury did not commit error in failing to award damages for physical disability.

Loss of Enjoyment of Life
It appears as though, with the help of medication, Jordan has returned to being the Jordan he was before the accident. However, he was not himself for at least two years, and his residual concentration problems will likely cause him problems in the future. This has all affected his ability to enjoy life as he would have if it were not for this accident. We find the jury's failure to award Jordan damages for loss of enjoyment of life to be an abuse of discretion and award him $25,000.00.

Dale and Debra's Damages

Loss of Consortium
This court recently reviewed the requisites for parents to recover for loss of consortium when their child has been injured in an accident in Precht v. Case Corp., 99-1296, p. 24 (La.App. 3 Cir. 2/16/00); 756 So.2d 488, 503, writ denied, 00-0791 (La.5/5/00); 761 So.2d 546, quoting Morrison, 738 So.2d at 1122:
Civil Code art. 2315 gives parents a cause of action for loss of consortium when their child is injured by the fault of another. Parents must prove, by a *611 preponderance of the evidence, any one or more of the following: (1) loss of love and affection, (2) loss of society and companionship, (3) loss of performance of material services, (4) loss of financial support, (5) loss of aid and assistance, and/or (6) loss of fidelity.
A child may sustain physical injury without necessarily causing his parents a loss of consortium. Mental anguish suffered by the parents because of an injury to their child is not compensable in a loss of consortium claim.
(Citations omitted.)
We have considered these factors, as well as the facts presented herein, and conclude that the jury's award of $2,000.00 was not abusive.

Decree
The jury's award for mental pain and suffering, past and future, is increased to $150,000.00 and its award for future medical expenses is increased to $61,936.00. Additionally, Jordan is awarded $25,000.00 for loss of enjoyment of life. The remainder of the jury's awards for damages are affirmed. All costs of this appeal are assessed to Kenneth Roberts.
AFFIRMED IN PART, REVERSED IN PART, AND RENDERED.