STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

03-1594


GLEN J. MOODY

VERSUS

STATE FARM MUTUAL AUTO INS. CO., ET AL.


**********
APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. 20015755
HONORABLE DURWOOD WAYNE CONQUE, DISTRICT JUDGE

**********

ULYSSES GENE THIBODEAUX
CHIEF JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, C.J., Sylvia R. Cooks, and Oswald A. Decuir, Judges.

AFFIRMED IN PART, AMENDED IN PART,
REVERSED IN PART AND RENDERED.

James Paul Lambert
Curtis & Lambert
P. O. Box 80247
Lafayette, LA 70598-0247
Telephone: (337) 235-1825
COUNSEL FOR:
       Plaintiff/Appellant - Glen J. Moody

Preston D. Cloyd
Cloyd, Wimberly & Villemarette, L.L.C.
P. O. Box 53951
Lafayette, LA 70505-3951
Telephone: (337) 289-6906
COUNSEL FOR:
       Defendant/Appellee - State Farm Mutual Auto Insurance Co.
Ian Alexander Macdonald

**Perret, Doise**
**P. O. Drawer 3408**
**Lafayette, LA 70502-3408**
**Telephone:  (337) 262-9000**
**COUNSEL FOR:**
> **Defendant/Appellee - Progressive Security Insurance Co.**

THIBODEAUX, Chief Judge.

In this automobile accident case, the plaintiff, Glen J. Moody (Mr. Moody), appeals the judgment of the trial court in favor of the defendants, Meghan Lynn Carpenter (Ms. Carpenter), her insurer, State Farm Mutual Automobile Insurance Company (State Farm), and Mr. Moody's un/underinsured motorist carrier, Progressive Insurance Company (Progressive). The defendants stipulated to liability. At the conclusion of a jury trial in this matter, a verdict was returned awarding Mr. Moody $7,677.13 in past medical expenses and $7,000.00 in general damages. There was no award for future medical expenses. Mr. Moody appeals.

For the following reasons, we affirm the judgment of the trial court awarding Mr. Moody general damages. However, we amend the judgment to increase the general damage amount to $35,000.00. Further, we reverse the jury's failure to award Mr. Moody any amount for future medical expenses and award the amount of $71,480.00 for that item of damages.

I.

**ISSUES**

Mr. Moody assigns as error the jury's failure to award him any amount for future medical expenses. Mr. Moody further assigns as error the amount the jury awarded for general damages. He asserts that $7,000.00 in general damages is abusively low.

## FACTS

On November 20, 2000, Mr. Moody and Ms. Carpenter were involved in a vehicular collision when the vehicle driven by Ms. Carpenter turned left in front of the pick-up truck driven by Mr. Moody. Ms. Carpenter's liability for causing the accident is not in dispute. Upon impact, Mr. Moody was thrown forward into the steering wheel of his truck with such force that it bent around the steering column. Mr. Moody was transported to the hospital by ambulance. He testified that immediately following the collision he lost consciousness, regained it, but lost consciousness several more times while en route to the hospital.

In addition to the damage to his truck, Mr. Moody claimed that he suffered several bodily injuries. He suffered bruising to his chest when his body was thrown into the steering wheel upon impact. His chest was also scraped to the extent that some chest hairs were torn out. Mr. Moody testified that he experienced pain and burning in his eyes as well as head pain. With respect to his left ear, Mr. Moody stated that since the accident, he started hearing a "whistling" sound when his ear is touched or scratched. Some years prior to this accident, Mr. Moody had back surgery. He testified that his back pain increased after the accident with Ms. Carpenter.

According to Mr. Moody, his knees did not give him problems until after the accident. He testified that before the accident he could jog and dance. After the accident, he could no longer engage in those activities. Mr. Moody is the owner of several apartment properties. To get to some of the properties to repair or show them, Mr. Moody is required to walk up stairs. He testified that activities like walking upstairs, carrying things of any weight and walking distances cause great pain due to the injury to his knees. Mr. Moody is unable to cut the grass on his properties, and is unable to do a lot of the repair work necessary for the upkeep of his properties.

Although he can lease the units, he is unable to show some of them because he cannot climb the stairs. The ability to walk long distances is necessary for him to do his job as duck hunting guide. His knees prevent him from doing so.

At the time of trial, Mr. Moody was fifty-four years old. He admitted that at the time of the accident he was not in the best of physical health. In 1980, he was involved in an on-the-job accident where he tore ligaments in both his hands and required surgery on both wrists as well as rehabilitation. During his rehabilitation, he completed his college education and graduated with a B.S. degree in mid-management. It was from that point on that he was considered medically disabled. He relied on the income generated from his investment properties to earn a living. As a teen, Mr. Moody was shot in his left eye while hunting. As a result of the shooting, his vision became severely distorted. However, despite his eye injury, he continued to engage in activities like sports, hunting and farming.

In 1985, Mr. Moody was involved in another vehicular accident. He testified that his back problems began as a result of that accident, and subsequent surgery to correct the problem did not alleviate the pain. He was involved in another vehicular collision in 1989. In 1992, an eighteen-wheeler truck pulled out in front of the vehicle Mr. Moody was operating causing the two vehicles to collide. In 1987, after his back surgery, Mr. Moody was treated for back pain by Dr. Donald C. Harper, a neurologist and pain management specialist. Since the 1990s, Mr. Moody had been taking Methadone, prescribed by Dr. Harper to alleviate his back pain. Two days following the accident of November 2000, Mr. Moody sought treatment from Dr. Harper. Dr. Harper treated Mr. Moody for low back pain, headaches and leg pain prior to the accident. After the accident, Mr. Moody told him of the pain in his knees. Dr. Harper testified that Mr. Moody had not made a complaint of knee pain during the

3

ten years that he treated him before November 2000. Dr. Harper also testified that Mr. Moody is a patient who typically minimizes the pain that he feels.

## III.

## LAW AND DISCUSSION

Mr. Moody asserts that the jury erred in failing to award damages for future medical expenses. Mr. Moody argues that his knee problems were caused by the accident. He further argues that because the jury awarded him the full amount of medical expenses he incurred as a result of his accident, which included expenses related to the treatment of his knees, the jury concluded that the accident caused his knee problems. Thus, Mr. Moody contends, "the jury clearly rejected [the defendants'] argument that [his] knee problems were not caused by the accident." Therefore, it was abuse of the jury's discretion to fail to award medical expenses related to the future treatment of his knees. The defendants argue that there was evidence in the record that Mr. Moody possessed a degenerative condition with respect to his knees and was severely disabled by other accidents prior to the accident involved in this appeal. The defendants further assert that Mr. Moody's complaints following the accident were limited to headaches and sternum pain, all of which resolved eliminating the need for future medical treatment.

The standard of this court's review of damages was established in *Reck v. Stevens*, 373 So.2d 498 (La.1979) and was confirmed in *Youn v. Maritime Overseas, Corp.*, 623 So.2d 1257 (La.1993), *cert. denied*, 510 U.S. 1114, 114 S.Ct. 1059 (1994). Those cases instruct that we cannot disturb a trial court's award of damages unless we find that the award constitutes an abuse of the trial court's discretion. After carefully reviewing the record, we find that the trial court abused its

4

discretion in failing to award Mr. Moody any amount for future medical expenses and in its assessment of general damages.

To recover damages for future medical expenses, the plaintiff must show it is more probable than not that future medical expenses will be incurred. Medical testimony is required to support an award of future medical expenses. *Clavier v. Roberts*, 00-1666 (La.App. 3 Cir. 4/4/01), 783 So.2d 599, *writ denied*, 01-1662 (La. 9/21/01), 797 So.2d 672. Dr. Harper, Mr. Moody's treating physician, testified that after his many years of treating Mr. Moody, he determined that Mr. Moody is a stoic person, one who may feel pain, but does not show it externally. In other words, Dr. Harper felt that Mr. Moody under-expresses his pain level. Dr. Harper clearly testified that prior to the November 20, 2000, accident there was very little focus on any knee problems. On September 21, 2000, Mr. Moody's last visit with Dr. Harper before the accident, Mr. Moody complained of pain in his arms, neck and right leg but he did not make any complaints of pain in his knees.

It was not until November 30, 2000, approximately one week after the accident, that Mr. Moody complained to Dr. Harper about, among other things, having pain in his knees. After his examination, Dr. Harper opined that Mr. Moody had experienced new pains involving his head and eyes as well as his knees. Dr. Harper continued to treat Mr. Moody through the year 2003 and opined that Mr. Moody's persistent problems post-accident were eye and knee pains. Dr. Harper referred Mr. Moody to an orthopedic surgeon, Dr. Robert Morrow, Jr., for his knee pains.

As late as March 18, 2003, Mr. Moody still had complaints of pain in his knees and described the pain to Dr. Harper as "shooting, stabbing, gnawing, burning, exhausting, miserable, unbearable and continuous." The pain was worse in the evening. On a scale of one to ten, with ten being the worst pain, Mr. Moody rated the pain as an eight. With respect to how the pain impacted his life, Mr. Moody described

5

to the doctor that he had problems walking, driving and carrying things. He also experienced insomnia, lack of appetite and tiredness, as well as sweating and difficulty sleeping as a result of the medicines he took. The pain also affected how he interacted with other people. Dr. Harper admitted that a lot of Mr. Moody's complaints of pain preceded the accident. However, he concluded that his pain was aggravated by the accident and his knee pain occurred subsequent to the accident.

Dr. Morrow, the orthopedic surgeon to whom Dr. Harper referred Mr. Moody, diagnosed Mr. Moody with chondromalacia in his knees, a degenerative change in the cartilage of the knee that is unlikely to improve without surgery, such as a total knee replacement. It was Dr. Harper's opinion that Mr. Moody's knee complaints were related to his November, 2000 automobile accident. Dr. Harper admitted that it is reasonable to believe that absent the accident, he would have continued to treat Mr. Moody for the chronic pain he experienced. He further stated that Mr. Moody did not complain of knee pain on every visit after the accident.

As noted, Dr. Harper referred Mr. Moody to Dr. Morrow. This decision was made after the pain in Mr. Moody's knees failed to respond to conservative treatment. On his first visit with Dr. Morrow, the doctor objectively detected "patella femoral crepitation" when he did an active range of motion examination. After getting the result of x-rays and an MRI of Mr. Moody's knees, Dr. Morrow ultimately diagnosed chondromalacia in both knees. His examination further convinced him that Mr. Moody did not have pre-existing advanced degenerative changes in his knees. The doctor concluded that Mr. Moody had early degenerative changes in his knees, but post-traumatic knee pain. The MRI revealed mild to moderate wear and tear on the medial or inside of his knees as well as mild to moderate osteoarthritis. On his left knee he had a small tear. Dr. Morrow testified that the tear could have happened due to repetitive use or trauma. When Mr. Moody made contact with the dashboard of his

6

truck, Dr. Morrow opined he could have "compressed his kneecap against the femur. And that's the articular surface that he has trouble with."

Normal activities like walking, climbing stairs and squatting, would all aggravate Mr. Moody's knee problems. Dr. Morrow testified that some of Mr. Moody's knee problems existed before the November 20, 2000, accident. However, there are no records of his knees being in pain or of him receiving any treatment therefor. Thus, Dr. Morrow concluded that the direct trauma to his knees in the accident exacerbated his pre-existing asymptomatic condition. The last visit Mr. Moody had with Dr. Morrow prior to trial in this matter was March 27, 2003.

Dr. Morrow described some of the treatment he administered to Mr. Moody to alleviate his knee pain. The doctor prescribed various exercises to strengthen Mr. Moody's quadriceps, including some done in a pool as well as isometrics. Dr. Morrow also tried some medications to help Mr. Moody. However, Mr. Moody had stomach irritation as a result of the medications and had to be taken off of them. Further, Mr. Moody's activities were restricted. Dr. Morrow testified that Mr. Moody has to stop doing any type of activities that aggravate his knee pain such as ascending and descending stairs because climbing stairs is an activity that "increases the compressive forces between the patella and the femur." The doctor informed the court that kneeling has the same affect.

The anti-inflammatory medication Mr. Moody takes to alleviate the pain in his knee requires close monitoring of his liver and kidney functions by a doctor every three months. Dr. Morrow testified that the cost of one pill of the anti-inflammatory medicine is $2.00. Mr. Moody is required to take two pills per day; thus, his cost per day for medication would be $4.00. Mr. Moody would also require a diagnostic MRI every other year at a cost of approximately $1,000.00 per knee and x-rays once a year, at a cost of $250.00. Dr. Morrow testified that the condition of

Mr. Moody's knees did not make him a candidate for surgery at this time. Although Mr. Moody's knees show early indications of arthritis, Dr. Morrow testified that the arthritis is not severe because there was no "bone on bone" contact in Mr. Moody's knees. Dr. Morrow opined that absent the November 2000 accident, the pre-existing condition of Mr. Moody's knees may have caused him to develop knee problems in the future. However, there is no way to tell how far in the future the problems would have occurred or how severe the problems would be. The accident accelerated the onset of symptoms. Dr. Morrow estimated that Mr. Moody has a life expectancy of seventy-eight years.

On cross examination, Dr. Morrow testified that Mr. Moody did not go to his office about his knees until approximately six-and-a-half months after the accident. Both Dr. Harper and Mr. Moody explained that this delay in seeking treatment from an orthopedic surgeon was due to the desire of Dr. Harper and Mr. Moody to treat the condition conservatively. At the time of his first examination, Dr. Morrow found that Mr. Moody had full range of motion in his knees. A review of the records from the ambulance company that transported Mr. Moody to the hospital emergency room reveal that Mr. Moody did not complain about knee pain, discoloration or bruising. The emergency room nurse's assessment notes no pain in Mr. Moody's knees. Dr. Morrow further admitted that his opinion that Mr. Moody's knee problems were exacerbated by the accident is premised upon Mr. Moody sustaining direct trauma to his knees in the accident. Mr. Moody gave a history to Dr. Morrow of his knees banging into his truck's dashboard in the accident. Dr. Morrow admitted that the medical records he reviewed did not reveal direct trauma to Mr. Moody's knees. However, Dr. Morrow opined that it is likely that Mr. Moody's knees did collide with the truck's dashboard because he was in a sitting position, was

8

pushed forward into the steering wheel with enough force to bend the steering wheel and sustained injuries to his chest, pelvis and head.

Dr. Morrow explained that patients who sustain head injuries are not the most reliable source of immediately giving information about all injuries they may have suffered in an accident. Thus, Dr. Morrow testified that he did not find it unusual that Mr. Moody did not mention a knee injury during his emergency room visit. The doctor further explained that a knee that sustained impact trauma may not immediately cause problems, but that symptoms may develop over time as the knee is used.

Mr. Moody's fiancée, Sherrie Lagrange, testified that he did not complain of knee pain until after the accident. The testimony of his treating physician, Dr. Harper, who had been treating Mr. Moody for pain for ten years, corroborates the testimony of Ms. Lagrange and Mr. Moody as to the onset of his knee problems. The defendants make much of the fact that Mr. Moody did not see Dr. Morrow until May 1, 2001. However, he complained about knee pain to his primary physician within a few days of the accident. When there was nothing more Dr. Harper could do to alleviate Mr. Moody's knee pain, he referred him to Dr. Morrow, the orthopedic specialist. It is clear that Mr. Moody had some type of degenerative knee problems prior to the November 2000 accident. However, Dr. Morrow testified that his pre-existing knee problems were mild and could have remained asymptomatic for many years. Both doctors testified that they felt that the accident caused an aggravation of his preexisting knee condition. There is no medical evidence to the contrary. The doctors' testimony also established that Mr. Moody will continue to have knee problems and need pain management therapy. While it is clear that Mr. Moody was not in the best of health prior to the November 2000 accident— he had headaches, low back pain, leg pain and depression as well as a weight problem—"a defendant takes

9

his victim as he finds him and is responsible for all natural and probable consequences of his tortious conduct." *Saine v. City of Scott*, 02-265, p. 3 (La.App. 3 Cir. 6/12/02), 819 So.2d 496, 499, *quoting, Rhodes v. State, Through Dept. of Trans. and Dev.*, 94-1758, p. 13 (La.App. 1 Cir. 12/20/96), 684 So.2d 1134, 1144, *writ not considered*, 97-242 (La. 2/7/97), 688 So.2d 487.

Mr. Moody can no longer work as a duck hunting guide because he cannot walk long distances. He can no longer dance at festivals and cannot perform his maintenance chores at the apartment complexes he owns and manages. Prior to the November 2000 accident, Mr. Moody would show his apartments to potential tenants. Some of the apartments are two-story apartments. Due to the pain in his knees and the advise from his doctors to cease climbing stairs, he must rely on others to show the two-story apartments to prospective tenants or allow the tenants to view the apartments alone. Mr. Moody had to move out of his own two-story townhouse apartment into a one-story flat. There is evidence in the record that Mr. Moody, an active man despite his many physical challenges, will endure pain for the rest of his life. The record reveals that the jury's award for past medical expenses included all of Mr. Moody's medical expenses related to the treatment of his knees. Thus, it appears that the jury felt that his knees were damaged in the accident. Mr. Moody has suffered with increasing knee pain since November 2000. He can no longer engage in the activities he enjoyed or take care of his own property. Thus, we find that the amount awarded by the jury for Mr. Moody's general damages is abusively low. Therefore, we increase the general damages award from $7,000.00 to $35,000.00.

With respect to future medical expenses, we find that the medical testimony presented in this case produced sufficient evidence that Mr. Moody will need treatment for his knee problems for the rest of his life. Thus, the jury erred in failing to award any amount for future medical expenses. Damages for future medical

10

expenses are special damages, which can be established to a reasonable mathematical certainty, though not necessarily precisely. *Wainwright v. Fontenot*, 00-492 (La. 10/17/00), 774 So.2d 70. At the time of trial, Mr. Moody was fifty-four years old. Evidence in the case revealed that he has a life expectancy of seventy-eight years. The evidence also revealed that Mr. Moody will have to undergo quarterly office visits, annual x-rays and MRI studies of his knees every other year. Dr. Morrow, Mr. Moody's treating orthopedist, estimated that the cost for the office visits would be $12,480.00 and that the x-rays would cost $24,000.00. Dr. Morrow also testified that Mr. Moody would have to continue taking prescribed medications throughout his life at a cost of approximately $35,000.00. Therefore, we award the amount of $71,480.00 in future medical expenses.

IV.

**CONCLUSION**

For the reasons assigned, we affirm the trial court's judgment insofar as it awarded the plaintiff, Glen J. Moody, general damages. However, we amend and recast the trial court judgment so as to increase the quantum of general damages in favor of Glen J. Moody from $7,000.00 to $35,000.00. We reverse the trial court judgment insofar as it failed to award Glen J. Moody any amount for future medical expenses. To that end, we order that there be judgment in favor of plaintiff, Glen J. Moody, and against defendants, Meghan Lynn Carpenter, State Farm Mutual Automobile Insurance Company and Progressive Insurance Company, in the amount of $71,480.00 for future medical expenses. Finally, it is ordered that costs are to be borne by the defendants, Meghan Lynn Carpenter, State Farm Mutual Automobile Insurance Company and Progressive Insurance Company.

11

**AFFIRMED IN PART, AMENDED IN PART, REVERSED IN PART AND RENDERED.**